**INTERNATIONAL LADIES' GARMENT WORKERS' UNION AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 366, Docket 28228.**

United States Court of Appeals Second Circuit.

Argued June 10, 1964.

Decided Nov. 20, 1964.

See, also, 2 Cir., 339 F.2d 126.

Simon H. Rifkind, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief) (Jay H. Topkis and Thomas R. Farrell, Jr., New York City, of counsel), for petitioner.

Warren M. Davison, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Ira M. Lechner, Atty., N. L. R. B., on the brief), for respondent.

Before FRIENDLY, SMITH and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

The National Labor Relations Board found the International Ladies Garment Workers Union [ILGWU] to have violated sections 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (5), by refusing to bargain with the certified representative of its business agents, organizers, educational directors and certain other personnel. ILGWU seeks review of the Board's order requiring it to cease and desist from this refusal to bargain and the Board has cross-petitioned for enforcement of its order. We overrule ILGWU's claims that the classes of its employees sought to be organized were not within the protection of the Act, but we sustain certain of its objections to the exclusion of ballots and remand for further proceedings by the Board.

*Proceedings Before the Board*

On December 27, 1960 the Federation of Union Representatives [FOUR] filed a representation petition with the Board, pursuant to section 9(c) of the Act. It sought to be recognized as the bargaining representative of "All General Office staff employees listed as organizers" in the latest ILGWU financial report, a group totalling 262. The Board ordered a hearing on the petition, and on April 21, 1961 found that ILGWU was engaged in commerce, that FOUR was a labor organization which claimed to represent certain employees of ILGWU, that a question affecting commerce existed concerning the representation of certain ILGWU employees, and that an appropriate unit for the purpose of collective bargaining within section 9(b) of the Act was "all individuals on the payroll of the International Ladies Garment Workers' Union (as distinguished from its locals) who serve as business agents, organizers, educational directors, and who do union label, and political work excluding office clericals, supervisors, professionals, watchmen and guards as defined in the Act." The Board rejected ILGWU's contention that "the business agents here involved are managerial employees, or for other reasons, should not be considered employees under the Act," relying on its decisions in Airline Pilots Association, International, 97 N.L.R.B. 929 (1951) and American Federation of Labor, 120 N.L.R.B. 969 (1958). Pursuant to this decision, an election was ordered, at which employees within the bargaining unit were asked to decide whether they wished to be represented for purposes of collective bargaining by FOUR.

The election was duly held on May 12, 1961, and of the 248 votes excluding two void ballots, 115 were cast for FOUR, 100 were against it, and 33 were challenged. In accordance with the Board's rules and regulations, the Regional Director conducted an investigation and recommended to the Board that 26 challenges be sustained, 4 overruled and 3 ballots held in abeyance pending the disposition of unfair labor practice charges. Both parties took exceptions to certain recommendations of the Regional Director. The Board, following the Regional Director's recommendation, ordered the four ballots to be opened and counted. All these were cast against FOUR, making the tally 115–104. With regard to nine of the ballots challenged by FOUR on the ground that the voters were supervisors the Board found that material and substantial issues of fact had been raised in connection therewith and directed a hearing to be held on the eligibility of those voters. The hearing officer recommended that the challenges be overruled and that all those ballots be counted. The recommendation was followed by the Board, and all nine were against FOUR, making the total 115 to 113 in its favor. As to ten other ballots, however, the Board sustained the challenges. Shortly afterward, FOUR was certified as bargaining representative.

Having been certified as the bargaining representative, FOUR thereupon demanded that ILGWU bargain with it. Upon the International's refusal to do so, FOUR filed a complaint which culminated in the unfair labor practice proceeding under consideration here. ILGWU admitted that it had refused to bargain, this being the only available method for presenting its legal position, but claimed it was justified in that course. Considering that all the defenses asserted by ILGWU had been litigated and determined adversely to ILGWU during the representation proceeding and that none of its proffered evidence was newly discovered or previously unavailable, the Trial Examiner granted the General Counsel's motion to strike them.

He recommended that an order issue requiring ILGWU to bargain collectively with FOUR, and to take certain other action. This recommendation was followed by the Board, and the petition to review the order followed.

### Structure of the Union

ILGWU is a far-flung labor organization with about 450,000 members in the garment and needle trades, throughout the United States and Canada. Its basic unit of organization is the local, of which there are over 500. Locals may be formed and chartered at the request of seven or more workers in the industry, and they are in part geographical and, in larger cities, in part organized according to the division of the industry involved. In metropolitan areas, locals are grouped into joint boards, each of which is composed of locals in a single branch of the industry, and in certain areas they are also grouped into district Councils, which correspond functionally to joint boards except that a larger area than one city or metropolitan area is involved. Locals, joint boards, and district councils elect delegates to the International's triennial convention. In the intervals between conventions, administration of the International's affairs is in the hands of its General Executive Board, which consists of the President, the General Secretary Treasurer and 21 Vice-Presidents. All these officers are salaried.

On the lower levels of the International's paid professional staff are business agents, organizers and educational directors, who are appointed by the President with the consent of the General Executive Board. In areas where joint boards and district councils exist, personnel of this category are on the payrolls of these units, and they are paid through assessments on member locals. Outside these areas, such personnel are on the International's payroll, and it is only these who are the subject of this proceeding. The country is divided into ten regions for purposes of administration of the International's affairs, each of which is headed by a

manager who is usually also a Vice-President and member of the General Executive Board. There are also intervening layers of supervisors between the regional manager and the business agents. In one typical region, the Eastern, there is an Assistant General Manager, and below him 15 local managers in charge of 34 local unions. The local managers supervise business agents directly. In the Northeast department, there is a director (an International Vice-President), two area supervisors, a field supervisor for organization, and 15 district managers who supervise 65 to 70 business agents.

The duties of business agents are diverse, but they principally involve communication between rank and file union members in the shops, and the employers. One of their most important functions concerns the setting of rates for the different types of operations performed in garment manufacturing and finishing establishments. Because of the peculiar structure of this industry, with its many independent, small shops and the great variety and diversity of its products, formal collective bargaining agreements are usually somewhat skeletal matters, defining in broad terms the rights and responsibilities of the parties. Furthermore, most workers in the industry are paid on a piece-rate rather than an hourly wage basis. Consequently, as each new job comes into a shop, it may be necessary to set new piece-rates which will return workers a satisfactory weekly paycheck. The business agent normally conducts negotiations regarding piece-rates with employers. Depending on his evaluation of the employer's willingness to cooperate with the union, he may follow a "hard" or "soft" policy in these negotiations. Similarly, the business agent deals with the employer over such common matters as distribution of work among different employees, in order to assure equal treatment; extension of employee probationary periods (during which the employer may discharge a newly hired worker without cause); authorization for overtime work; and arranging holiday schedules. In all of these, he may take a "hard" or "soft" line. The business agent visits the shops represented by the local or locals which he serves regularly, conferring with shop chairladies or, sometimes, with workers directly, to determine whether there is any action the union should take. He has the responsibility to negotiate a settlement of grievances, if possible, otherwise referring them to arbitration. In the event of any work stoppage by employees in a shop, he is obligated to terminate it within twenty-four hours, according to ILGWU's standard collective bargaining contract. He attends and participates in the regular meetings of the locals under his jurisdiction, meetings of shop chairladies, and other types of union functions. When the time for negotiating new contracts arrives, he confers with and gives recommendations to the regional manager who will be the union's chief spokesman at the bargaining table.

The International concedes that the organizers on its payroll have much less responsible positions than the business agents. Their task is principally to contact non-union workers and solicit their membership in ILGWU, with the object of having the union recognized for collective bargaining purposes in unorganized shops. They meet with workers, distribute literature, issue press releases, and in general seek to convince workers of the advantages of union membership. These responsibilities end when the union is recognized voluntarily, or the NLRB certifies it as representative of the plant after an election. Organizers work under the supervision of either a chief or General Organizer, or directly under the Regional Manager. Fifty or sixty organizers are included in the unit. Some two dozen educational directors are also in the unit. They direct educational activities of local union members, including the teaching and establishment of classes in arts, crafts, sports, drama and the like and also work for political education of the members. They work under supervision of local managers and

also under the central direction of ILGWU's Political and Educational Departments. Some educational directors also do union label publicity work, and a few service shops as business agents.

## THE STATUS OF BUSINESS AGENTS

 ILGWU maintains that its business agents, organizers and educational directors are either "supervisors"[1] or "managerial employees" and hence not entitled to the protection of the National Labor Relations Act. We find this position particularly unpersuasive with regard to the organizers and educational directors and hold that they are within the protection of the Act. The difficult question to decide is whether the business agents are "supervisors" or "managerial employees."

 The Business Agents are not "Supervisors." Section 2(3) excludes "supervisors" from the protection of the Act and section 2(11) defines a "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action * * *." Although business agents may play a significant role in the life of the union, they are not "supervisors" within the specific meaning of the statute.

The business agents do not "supervise" the rank and file union members. They may discuss and negotiate the terms and conditions of employment with the employer of the rank and file union members but they have no *authority* to do enumerated acts on behalf of the employer. While the business agents have the power to *present* grievances on behalf of the rank and file union members,

they do not have the authority to *adjust* grievances as required by section 2(11) and this distinction between presenting a grievance and adjusting a grievance is preserved throughout the Act. See, e. g., Section 9(a). ILGWU attaches great significance to the presence of the words "assign" and "responsibly to direct" in section 2(11). But for these words to lend support to ILGWU's position one must abstract these words from their context and ignore the purpose of the section as a whole. Although there are many ways in which one person can "direct" and "assign" another, only if the individual "directs" or "assigns" *qua* employer, or *qua* representative of their employer, such as a foreman might do, does the individual "supervise" within the meaning of section 2(11). The sponsors of section 2(11) were interested only in excluding from the protection of the Act "the supervisor vested with * * * genuine management prerogatives." S. Rep. No. 105, 80th Cong., 1st Sess., p. 4, 1 Leg.Hist. of LMRA, 1947, p. 411. Whatever "directing" or "assigning" of the rank and file union member may be entailed in the business agent's representation of the member, it is not the kind envisioned in section 2(11).

 Even if it is assumed *arguendo* that the business agents "supervise" the rank and file union members or shop chairladies, they do not supervise them in "the interest of the employer" of the rank and file union members or chairladies. ILGWU contends that the business agent supervises the union members in the interest of *his* employer, ILGWU, and the question is who is referent of "the employer" in section 2(11). The natural inference to be drawn from the language of section 2(11), especially if attention is paid to the words *"other* employees," is that the employer referred to is the employer of those being super-

---

1. ILGWU's failure to raise the "supervisor" issue below does not preclude it from raising it at this stage. This omission on the part of ILGWU does not appear to be part of ILGWU's deliberate strategy nor does it work any prejudice on the Board. The issue is not dissimilar to the "managerial employee" argument, it presents essentially a legal question, all the necessary information is before this Court and the Board's position is known.

vised. ILGWU points to section 2(3) which provides that "[t]he term 'employee' * * * shall not be limited to the employees of any particular employer" and insists that this inference is mistaken. But we are not persuaded. Even if the term "employee" is not confined to the employees of any particular employer, this does not mean that under section 2(11) the alleged supervisor need not be acting in the interest of the supervised-employee's employer, whoever it may be. It does not follow that the employer referred to in section 2(11), in whose interest the supervision must be undertaken, need not be the employer of those employees being supervised simply because these employees can have more than one employer. The legislative history supports this view and amply shows that section 2(3) had a wholly different purpose than that which the ILGWU now strains to attribute to it. The Senate Report (S.Rep. No. 573, 74th Cong., 1st Sess. p. 6, 2 Leg.Hist. of the NLRA, 1935, p. 2305) explains this language as follows:

> The term 'employee' is not limited to the employees of a particular employer. The reasons for this are as follows: Under modern conditions employees at times organize along craft or industrial lines and form labor organizations that extend beyond the limits of a single-employer unit. These organizations at times make agreements or bargain collectively with employers, or with an association of employers. Through such business dealings, employees are at times brought into an economic relationship with employers who are not their employers. In the course of this relationship, controversies involving unfair labor practices may arise. If this bill did not permit the Government to exercise complete jurisdiction over such controversies (arising from unfair labor practices), the Government would be rendered partially powerless, and could not act to promote peace in those very wide-spread controversies where the establishment of peace is most essential to the public welfare.

An analysis of the reasons for excluding "supervisors" from the protection of the Act confirms our position that the business agents' relationship to the rank and file union members do not make them "supervisors." The exclusion of supervisors was the product of the Taft-Hartley Act of 1947. By this part of the statute, Congress intended to overrule a policy of the National Labor Relations Board, sanctioned by the Supreme Court in Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), which held that foremen were entitled to collective bargaining rights under the Wagner Act. The sponsors feared that unionization of foremen and similar personnel would tend to break down industrial discipline by blurring the traditional distinction between management and labor. It was felt necessary to deny foremen and other supervisory personnel the right of collective bargaining in order to preserve their unqualified loyalty to the interests of their employers, and to prevent the dilution of this loyalty by giving them common interests with the men they were hired to supervise and direct. S. Rep. No. 105, 80th Cong., 1st Sess., pp. 3–5, 1 Leg.Hist. of LMRA, 1947, p. 411. There is little or no possibility that such problems would arise in the case of business agents, whose ability to work for the interest of rank and file labor in dealing with industry employers would not be diminished by according them collective bargaining rights vis-à-vis their own employer. Despite ILGWU's suggestions to the contrary, we find no evidence in the legislative history of the Taft-Hartley Act that Congress was in any way concerned with the possibility of organization of business agents and other union staff personnel and the differences between their functions and those of foremen hired by employers are sufficient to preclude any analogy.

We therefore conclude that there is no merit to ILGWU's contention that the

business agents are supervisors by virtue of their relationship to the rank and file union members. However, ILGWU also claims that the business agents are "supervisors" because of their supervisory authority over other ILGWU employees, such as organizers, trainees and clerical personnel. The testimony of ILGWU's own witnesses was conflicting and at the very most ILGWU could maintain that some business agents in some areas or cities have this supervisory authority over other ILGWU personnel. But we are dealing with business agents as a class, and we are interested in only those duties all business agents have in common. If some business agents have supervisory functions in regard to organizers, clerical personnel and trainees, then the proper procedure would have been for ILGWU to challenge the vote of those particular agents on the "supervisor" ground. The definition of the unit specifically excludes "supervisors" and FOUR took advantage of this exclusion in successfully challenging Cohn's vote. See infra, p. 3267. Even if some business agents have supervisory functions, this does not mean that all business agents are deprived of the protection of the Act.

 The Business Agents are not "Managerial Employees." Although the Act makes no special provision for "managerial employees," under a Board policy of long duration, this category of personnel has been excluded from the protection of the Act. See Ford Motor Co., 66 N.L.R.B. 1317 (1946); Palace Laundry Dry Cleaning Corp., 75 N.L.R.B. 320 (1947). The Board has defined "managerial employees" as "those who formulate, determine and effectuate an employers' policies," American Federation of Labor, 120 N.L.R.B. 969, 973 (1958), and while the Board's rulings on the scope of this definition are not a model of clarity, we are satisfied that, in this area at least, its policy cannot be deemed either arbitrary or in violation of the statutory language or purpose. In the absence of a conflicting statutory command, the Board has broad powers to determine the exercise of its

jurisdiction, N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 685, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), Pedersen v. N. L. R. B., 234 F.2d 417, 419 (2 Cir. 1956) (dictum), and hence judicial scrutiny of its decisions in this area must be appropriately limited.

The Board's decision that business agents are not "managerial employees" should not be disturbed. While the task of a business agent is one that requires considerable skill and judgment, the Board was clearly warranted in finding that they are more concerned with the day-to-day routine of industrial organization, following policy rather than establishing it. In American Federation of Labor, 120 N.L.R.B. 969 (1958), the AFL–CIO made the argument that the organizers on its payroll were "managerial employees" because they did not work under close immediate supervision, they represented their employer to the public, they might pledge their employer's credit in limited amounts, and they might engage in collective bargaining and sign agreements on behalf of the employer; but the Board rejected this argument. ILGWU has made a similar argument in regard to its business agents and we find nothing unlawful in the Board's refusal to deviate from the standards established in American Federation of Labor. ILGWU insists that, unlike the organizers involved in the American Federation of Labor case, the business agents here are members of the union which they serve and are eligible to be elected convention delegates. The recognition of a unit composed of union members who are eligible to be elected convention delegates, leads, so ILGWU would have us believe, to the dangers of factionalism and internal strife.

Regardless whether the Board could properly have accepted ILGWU's general policy argument, it surely was not compelled to do so and, to be sure, the dangers ILGWU points to are overstated. No more than about 2 per cent of the nearly 1,000 delegates at the 1959 Convention were within the bargaining unit.

124

The Board points out that at the ILGWU's 1962 Convention a resolution endorsing the policy of refusing to bargain collectively with the business agents had been adopted unanimously—a fact which hardly indicates that the members in FOUR had increased their influence to any degree. In view of the fact that the business agents are at the bottom of the union staff hierarchy and that they are required to sign resignations in blank which may be accepted by the General Executive Board at any time, we think it highly unlikely that any serious threat of a takeover of ILGWU by the business agents exists. Should such an attempt be made, at that time recourse could be had by ILGWU to the Board for alleviation of this condition. Furthermore, the Board need not have held that the eligibility of the business agents to be elected delegates to the convention or to be elected to any position in the International is sufficient to make them "managerial employees." This eligibility is not tantamount to a policy making role in the International and, in any event, if any individual business agent is elected to a high position of power and responsibility in the International, that particular business agent may be vulnerable to an ILGWU challenge. We are concerned here with business agents as a whole class, and the mere possibility of a few business agents succeeding does not make all of them "managerial employees."

### The Election Issues

ILGWU also objects that the representation election was improperly conducted because of the Board's disposition of the ten challenges made by FOUR.

Four ballots (those of Cohn, Reuter, Wells and Dubrow) were challenged on the ground that the employees who cast them were "supervisors" and "supervisors" were explicitly excluded in the Board's statement of the limits of the unit. Cohn was found by the Regional Director to be a supervisor and we think the challenge to her ballot could properly be sustained. However, the Regional Director specifically found that Reuter,

Wells and Dubrow were not "supervisors," and the challenges to their ballots cannot be sustained on that ground. The question then raised is whether the Board could properly sustain these challenges on a ground other than the one specified by FOUR (the challenging party) at the time of making its challenge. We answer this question, under the facts of this case, in the negative and therefore enforcement should be denied at least until the ballots of Reuter, Wells and Dubrow are opened and counted.

■ A rule which holds the challenging party to the specified ground of a challenge may be inferred from the Board's rules and regulations which require "a short statement of the reasons" (Sec. 102.69(a)) for challenging an election and from the very nature of the challenge procedure itself. Such a rule would limit, in the interest of efficiency, the scope of a Regional Director's inquiry and, more importantly, it would put the opposing party on notice as to the information that must be supplied to the Regional Director. While a party should not be penalized for oversight at the time of filing the challenge and the Regional Director should be able to discover new and unspecified grounds of ineligibility, if they exist, these interests could be accommodated by requiring that if a Regional Director does discover new grounds, he reveal them to the party objecting to the challenge prior to issuing his recommendation to the Board. The ultimate test would be: Did the failure of the Regional Director to inform the objecting party of the new ground of the challenge prejudice that party?

■ Applying this test to the facts of the present case it does seem that ILGWU was prejudiced. There is a substantial difference between the "supervisor" ground and the ground not specified in the challenge, namely, the "not in the unit" ground. ILGWU could have provided pertinent information regarding the duty of the challenged employees to determine whether they were "business agents," "organizers," "edu-

cational directors," "employees who do political work" or "employees who do union label work" and hence in the unit. ILGWU did present a great deal of this information in its exceptions to the Regional Director's recommendation to the Board, but this is not sufficient. Presumably the very recommendation of the Regional Director carries some weight with the Board and in all fairness ILGWU should have had the opportunity to present their view to the Regional Director, especially since there was no hearing before the Board. True, the Regional Director at the outset of his administrative investigation requested ILGWU to state its "position with respect to the eligibility or ineligibility of the challenged voters, and in addition to submit factual information or evidence bearing on the reason for the challenge." But to hold that this blanket request gave sufficient notice to ILGWU of the "not in the unit" ground would only encourage "fishing" requests and put the objecting party to the task of having to anticipate all the conceivable grounds that could be used to sustain the challenge.

 Six ballots (those of Weiss, Crone, Barker, Bernisky, Miller and Rosen) were challenged on the ground that the employees who cast them were not within the bargaining unit established by the Board. In sustaining these challenges on the "not in the unit" ground, the Board concluded:

> " * * * their duties primarily involve staff functions and in general have only an indirect relationship with the rank and file members. We therefore agree with the Regional Director that the individuals in question do not have sufficient community of interests to be included in a unit of essentially field organizers and business agents. Accordingly, we sustain the challenge to their ballots."

The basic reason we cannot accept the Board's ruling on these ballots is that we see no warrant in its Direction of Election for narrowing the unit at this late stage to exclude staff personnel. In the Direction of Election the appropriate unit was defined to include:

> All individuals on the payroll of the International Ladies' Garment Workers' Union (as distinguished from its locals) who serves as business agents, organizers, educational directors, and who do union label, and political work excluding office clericals, supervisors, professionals, watchmen and guards as defined in the Act.

While such an exclusion of staff personnel might well have been made at the time the election was initially ordered, we cannot agree that the Board has the power to change the boundaries of a unit after the election. To do so would mislead the voter, undermine the requirement to hold a hearing before establishing a unit and subvert the utility and effectiveness of the challenge procedure, because the parties would have no authoritative way of telling who is within the bargaining unit. Nor can we agree with the Board's contention that the history of the proceedings indicates that the words used to originally define the unit have less than their apparent reach. We deny enforcement and remand to the Board to determine whether Weiss, Crone, Barker, Bernisky, Miller and Rosen were in the unit as originally defined.

 The remand we are directing will require an evidentiary hearing only on Barker's eligibility to vote. A party is entitled to such a hearing before the Board only if its exceptions to Regional Directors' recommendation raise "substantial and material factual issues," N. L. R. B. v. Joclin Manufacturing Company, 314 F.2d 627 (2 Cir. 1963). Only the challenge to Barker's ballot presents such an issue requiring an evidentiary hearing—whether this dual employee has "sufficient interest in the unit's conditions of employment to be included in the unit." Berea Publishing Co., 140 N.L.R.B. 516, 519 (1963); N. L. R. B. v. Joclin Manufacturing Company, supra. Of course, the hearing need be held only after the Board opens the

ballots of Reuter, Wells and Dubrow, and reconsiders the objections to the challenges to the ballots of Weiss, Crone, Bernisky, Miller and Rosen, and then only if Barker's vote would make a difference in the outcome.