**RETAIL CLERKS INTERNATIONAL AS-
SOCIATION, AFL–CIO, and Retail
Clerks International Association, Local
880, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 19504.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 17, 1966.

Decided Aug. 16, 1966.

Petition for Rehearing Denied
Sept. 27, 1966.

Mr. S. G. Lippman, Washington, D. C., with whom Messrs. Tim L. Bornstein, Washington, D. C., and Joseph E. Finley, Cleveland, Ohio, were on the brief, for petitioners.

Mr. Warren M. Davison, Attorney, National Labor Relations Board, with whom

Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and George H. Cohen, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before BAZELON, Chief Judge, EDGERTON, Senior Circuit Judge, and BURGER, Circuit Judge.

BURGER, Circuit Judge.

Petitioners ask us to review and set aside an order of the National Labor Relations Board arising out of alleged violations of Sections 8(a) (5) and (1) of the National Labor Relations Act;[1] the Board in response asks enforcement of the order.

The Board found that the Retail Clerks International Association violated the Act by refusing to bargain with the representative of certain of its employees and by threatening employees with loss of their jobs unless they resigned from the union. The Board further found that Retail Clerks Local 880 had violated Section 8(a) (1) by engaging in coercive conduct with respect to certain of its own employees.

The controversy arises out of efforts of the Agents and Organizers Association (AOA) to organize three categories of union personnel: International Representatives, Council Organizers, and local union business agents.

The International includes 300 locals with over 400,000 members. In the United States and Canada the International is divided into seven organizing divisions. Each division is staffed with International Representatives, whose total number is between 70 and 100. Since most local unions are too small to employ full-time staffs on their own, they are united in District Councils, of which there are 10. These District Councils employ Organizers; Local 880, being large, employs its own staff including the business agents. The central issue in this case is whether the Board had warrant in the

---

I. 61 Stat. 140–141 (1947), 29 U.S.C. § 158(a) (5) and (1) (1964).

record and a reasonable basis in law for deciding that these three categories of Retail Clerks personnel are "employees" within the meaning of the Act.

### (1) *International Representatives*

The functions of the International Representative vary with the particular man, but the main occupation assignment of all of them is initiating organizing campaigns. They also do such related work as making demands of recognition on employers, negotiating contracts, directing strikes, processing grievances, handling NLRB proceedings, and supervising, advising, and assisting local unions. They are hired on a full-time basis and the majority are paid between $75 and $125 per week as a starting salary. They are subject to control by the Division Directors, who choose the organizing targets and with whom weekly reports must be filed, although the skill and experience of the particular International Representative will determine the degree of particularity in the instructions received and required in the reports filed. Even where the Representative has discretion to select a target, the decision to go forward with organizing is discussed with the Division Director and his superiors.

■ The accuracy of the findings of the Trial Examiner, adopted by the Board, is not contested. Rather, the International contends [2] that the International Representative is a managerial employee and so not within the scope of the Act.[3]

The Trial Examiner found that the Representatives were the "production workers" of the union. In doing so, he relied on long-standing Board practice of treating organizational workers very similar to these as employees and refusing to characterize them as managerial

employees. See, *e. g.*, Air Line Pilots Ass'n, 97 N.L.R.B. 929 (1951); AFL–CIO, 120 N.L.R.B. 969 (1958); ILGWU, 131 N.L.R.B. 111 (1961); Textile Workers Union, 138 N.L.R.B. 269 (1962). As the International itself complains, "The Board has, ever since [the Supreme Court required it to take jurisdiction over employees of labor unions [4]], treated almost all employees of unions as 'production workers,' regardless of factual differences." But it argues that the only case in which this Board policy has been reviewed by a court, International Ladies Garment Workers' Union v. NLRB, 339 F.2d 116 (2d Cir. 1964), involved personnel who did not exercise the same discretion they do here. The differences, however, are minimal, and, in any case, the court there implicitly approved the Board holding in AFL–CIO, *supra*, where the facts are substantially identical with those in this case.

The Board has not developed clear standards for determining what is a managerial employee; there seem, however, to be two tests. The first is whether, even if they do not supervise other workers, their position with the employer presents a potential conflict of interest between the employer and the workers, *e. g.*, employment interviewers who have authority in hiring, New England Telephone, 90 N.L.R.B. 639 (1950). This strand of the managerial employee test is often phrased in a more conclusory manner, *i. e.*, that the employee is closely related to or aligned with the management; such a determination, however, also seems to turn on the possibility of a conflict of interest arising, *e. g.*, time-keepers and expeditors, Bendix Aviation Corp., 47 N.L.R.B. 43 (1943); an office manager and record keeper who has no confidential information about other em-

---

2. It also leans on the claim that these men qualify as supervisory employees. Since, except for sporadic supervision of pickets, these men do not have fellow workers of their employer (the International) under them, it is clear they do not qualify as supervisory employees. International Ladies Garment Workers' Union v. NLRB, 339 F.2d 116 (2d Cir. 1964).

3. See International Ladies Garment Workers' Union v. NLRB, *supra*.

4. Office Employees International Union, etc. v. NLRB, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957).

ployees, Burke Brewery, Inc., 54 N.L.R.B. 1061 (1944).[5]

The Board also excludes from the protection of the Act, as managerial employees, "those who formulate, determine, and effectuate an employer's policies," AFL-CIO, *supra* at 973, and those who have discretion in the performance of their jobs, but not if the discretion must conform to an employer's established policy, Eastern Camera and Photo Corp., 140 N.L.R.B. 569, 571 (1963) (store managers who could set prices are not managerial). The rationale for this Board policy, though unarticulated, seems to be the reasonable belief that Congress intended to exclude from the protection of the Act those who comprised a part of "management" or were allied with it on the theory that they were the one from whom the workers needed protection.

█ It was reasonable for the Board to decide that the International Representatives do not fall within either of these two formulations.[6] Their work does not involve the potential clash of loyalties with which the first is concerned. While the International Representatives are occasionally negotiators, they are not negotiators for the International with respect to fellow employees, that is employees of the International. They negotiate only for members of the International who are employees of others. There is, therefore, no potential conflict of interest as there is in the usual managerial case. The Board concedes that if the AOA begins organizing retail clerks, rather than merely organizers of retail clerks, as its constitution now limits it, the potentiality of a similar conflict might exist. The International alleges

that the AOA does intend to do this, but the Board is warranted in relying on existing conditions when deciding the nature of an employee's job.

The International rests mainly on the second test, arguing that the Representatives exercise a high degree of discretion and are policy-making officials since they lead organizing campaigns, negotiate contracts, and call strikes. According to Board policy, however, discretion is not the touchstone if it must conform to the employer's established policy; such a definition of employee is a reasonable one, and the Board was warranted in applying it in this case.

The record discloses that most organizing campaigns are initiated on the direction of division directors and those that are not are at least cleared with the Representatives' superiors. Furthermore, the calling of strikes is subject to guidelines laid down in union policy and to the supervision of the International. Strikes must be authorized by the International's Executive Board and the terms of a contract must be approved by the International President—findings that the International does not challenge, except to say the President's veto does not establish a policy.

The Board was justified in concluding that the Representatives exercising even the greatest amount of discretion are not policy-making officials of the International. Furthermore, the Representatives make no decisions which affect employees of International and thus are not the kind of person against whose actions the Board need believe Congress intended to provide the workers protection.[7]

**5.** In some instances the test of alliance with management is applied even where a conflict of interest is not apparent, *e. g.*, buyers, Federal Tel. & Tel. Co., 120 N.L.R.B. 1652 (1958); credit managers who have authority to grant credit in limited amounts to customers, Diana Shop Spokane, Inc., 118 N.L.R.B. 743 (1957); and truck drivers who buy eggs from farmers for the account of the truck drivers' employer, Swift & Co., 115 N.L.R.B. 752 (1956). The rationale for these

cases has not been articulated by the Board. Failure to follow them was not arbitrary.

**6.** See International Ladies Garment Workers' Union v. NLRB, *supra*.

**7.** The International further argues that the Board discriminates between labor organizations' negotiators and negotiators of other employers and that workers with less discretion than the Representatives are held to be managerial when they work

## (2) *Council Organizers*

■ The International claims that Council Organizers, because they are elected by the District Councils' annual conventions, are not employees. It points to a series of cases in which the Board has excluded elected officials of labor organizations from bargaining units, particularly to the two representation cases decided simultaneously with the instant unfair labor case, Retail Store Employees Union, Local 444, 153 N.L.R.B. No. 16, n. 7 (1965); Retail Store Employees Union, Local 880, 153 N.L.R.B. No. 17, n. 9 (1965). In those cases, however, it seems that the elected officials (of local unions) were excluded because of the nature of their jobs rather than the manner in which the jobs were acquired.

There does not seem to be any reason why the fact of election should determine the status of a worker. The International argues that it is meaningless to require the "elected" to bargain with its electorate; yet this overlooks the fact that because the members elect an organizer does not mean they determine the *conditions* of his employment. Those conditions are independently established.

The International also argues that since the District Council controls the Council Organizers, holding them to be employees would force them to function as a political pressure group at the Council Convention. This argument is related to the question of whose employees the Organizers are and is partially disposed of by resolution of that question. See *infra* this page. But even if the Council Convention does have some control over the working conditions of their Organizers, the specter of possible political pressure seems spurious. There are four council organizers from the three divisions in which the AOA sought recognition in this case. Furthermore, the extent of the risk, and its relevance, are matters within the Board's domain.

The International makes the further contention that even if the Council Organizers are employees they are at least jointly employed by the International and the District Councils, not solely by the International, and that the Board's failure to join the appropriate District Councils as parties deprived them of the notice necessary for due process.[8]

There is substantial evidence to support the Examiner's finding that the District Council organizers are actually and effectively employed by the International. There was testimony that the Council Organizers are treated almost identically with the International Representatives, carry the same credentials, file the same reports, and are subject to the same supervision by the Division Directors. They do not file reports with Council personnel. While their salaries are set by the convention, these are subject to the approval of the International, and are paid out of District Council funds held for them by the International. Applications for employment as Council Organizers are filed with the International Office. Finally, on two occasions in the present controversy the International treated Council Organizers in the same manner as International Representatives. International President Suffridge's letter detailing opposition to AOA organizing efforts was addressed to "All RCIA local unions, Council and International Representatives," and even after this litigation had begun, the International answered the Board's General Counsel's request for names of "International Repre-

for management, citing, *e. g.*, Chrysler Corp., 36 N.L.R.B. 157 (1941); Vulcanized Rubber and Plastics Co., 129 N.L.R.B. 1256 (1961); New England Tel. & Tel. Co., *supra*. The touchstone in these cases, however, is not the discretion exercised but the potentiality of a conflict of interest.

8. It also argues that it will be impossible to comply with the NLRB order. However, if the International is truly unable to bargain with the Council Organizers, this would no doubt be a defense to any contempt action against it. *Cf.* United States v. Bryan, 339 U.S. 323, 332, 70 S.Ct. 724, 94 L.Ed. 884 (1950); NLRB v. Caroline Mills, Inc., 167 F.2d 212 (5th Cir. 1948).

sentatives" by providing a list that included council organizers.

### (3) Local 880's Business Agents

In addition to finding the International had committed unfair labor practices, the Board held that Local 880 had coerced its business agents to discourage union activity. Local 880 makes several complaints with regard to the Board treatment of its business agents. It argues that the Examiner's one-sentence finding was insufficient, that the business agents are managerial employees, and that the Examiner failed to treat the elected ones as managerial despite the fact that it so treated them in the companion representation case.

The record contains ample description of the business agents' job. Although their functions are slightly different from those of the International Representatives, the differences are not such as to preclude an application of the analysis of the International Representatives to the business agents. Petitioners' brief says there are substantial differences between the jobs, but does not spell out what the differences are or state how the Trial Examiner's finding is without basis in the record.

All local business agents of Local 880 were held to be employees in the instant proceeding while in the companion representation case some of these very same men—those who were elected to the Local's Executive Council—were excluded from the unit, since they passed on the selection of other business agents. Retail Store Employees Union, Local 880, *supra*. This deviation is not explained, but this issue is not before the court and does not require modification of the order.[9]

On transfer of the decision of the Trial Examiner to the Board, the union failed to make the necessary exceptions to the finding relating to the business agents.[10] An exception is necessary to preserve the point for appeal to this court. National Labor Relations Act § 10(e);[11] NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed. 2d 312 (1961); NLRB v. Izzi, 343 F.2d 753 (1st Cir. 1965). The International argued in its brief filed with the Board that the Trial Examiner's findings on the business agents were erroneous. Under 29 C.F.R. § 102.46(c), however, this was not properly included in the brief. Furthermore, the Board has held that a brief to it cannot cure the lack of an exception, Kings Electronics Co., 109 N.L.R.B. 1324 (1954).

### (4) AOA's Majority Status

The General Counsel did not prove that the signed membership cards which the AOA claimed gave it majority status were actually delivered to it prior to its demand for recognition. The International argues here that the Trial Examiner erred in presuming delivery of the authorization cards. Actually, however, the Trial Examiner held only that the Act does not require actual delivery and that a majority of the employees signing the cards was enough to constitute the AOA the bargaining agent; he buttressed this holding by saying that delivery can be presumed from signing, especially where, as in this case, the AOA told the employer it had a majority after three-quarters of the eligible employees had signed and it offered to prove its majority by submitting the cards to be checked. The Examiner concluded it would not have done this if it had not had the requisite cards in its possession. The

9. Even if we decided this question on the merits, the apparently erroneous inclusion of the elected business agents as employees would not change the result. Local 880 was found to have committed an 8(a) (1) violation; since coercion was directed at business agents who were not elected to the Executive Counsel, the fact that those who were so elevated should

not be considered employees is irrelevant to this unfair labor proceeding.

10. See Section 10(c), 61 Stat. 147 (1947), 29 U.S.C. § 160(c) (1964); 29 C.F.R. § 102.46 (1966).

11. 61 Stat. 147–148 (1947), as amended. 29 U.S.C. § 160(e) (1964).

648

International's answer to the AOA at the time of demand did not contest majority status.

■ We need not reach the issue of presumption of delivery since the Board was warranted in these circumstances in holding that the actual signing of the cards was all that need be proved to establish the AOA's majority. Where the employer does not contest the existence of a majority at the time demand is made on him by asking to see the cards, requesting independent inspection, or by demanding an election, the General Counsel need prove only that a majority had in fact signed cards and that there was an opportunity for inspection.

(5) *Revocation of RCIA's Subpoena*

■ The International sought a subpoena duces tecum to support a claim that the AOA was founded as a rump political organization within the International and was funded by rival unions, but the Trial Examiner revoked the subpoena at the hearing on the ground that it was not material to the issues involved in the proceeding. In his decision he added as a ground for revocation a statement that the International had only a suspicion on which to base these charges. The Board says here that it relies only on the theory that the request was irrelevant.

The Board's contention of irrelevancy is apparently two-fold. It argues first that the International sought the subpoena to prove that the AOA had been using psychological pressure on it to force capitulation to AOA bargaining demands. While that statement does exist, it is quite clear that the International considered the issue of the AOA's being a rump political group its main reason for the subpoena.

The second argument is that if the AOA later turns out to be a rump political group or a front for rivals of the International seeking to subvert it, the International can seek relief from the Board at that time. The Board cites two cases for this proposition, International Ladies Garment Workers' Union v. NLRB, 339 F.2d 116 (2d Cir. 1964), and

Bausch & Lomb Optical Co., 108 N.L. R.B. 1555, 1559 (1954), but neither one justified revocation of the subpoena. In *International Ladies Garment Workers' Union* the employer-union argued that the Board's decision to make a unit out of business agents eligible for election as convention delegates would lead to factionalism and internal strife. The Court held that while the Board could accept this argument it was not *compelled* to do so; it noted that the small number of business agents made it unlikely that they would be able to stage a takeover but that if an attempt should be made, the union could seek relief from the Board. In the instant case, the International sought to prove an existing purpose of the AOA, as distinguished from a possible effect of organization. Further, it was trying to place evidence before the Examiner, not attempting to dispute on appeal the Board's weighing of the evidence, as was the case in *International Ladies Garment Workers' Union*. Nor does *Bausch & Lomb* support the Board. There the Board held that if it turns out, after certification of a union, that the union is in competition with the employer, the employer need not bargain with it. There is nothing in the case to suggest that the existence of that competition, if known at the time, would not have prevented certification.

■ It was, therefore, error not to grant the subpoena, especially as "[r]equests for subpoenas should be viewed sympathetically in order to ensure a fair hearing." NLRB v. Dahlstrom Metallic Door Co., 112 F.2d 756, 758 (2d Cir. 1940). But we regard the error as harmless on this record. The likelihood of the AOA representing a threat of any significance to the present International management would seem minimal, even if it receives support from International rivals; the AOA constitution limits membership to organizing employees, and the number of these in a 400,000 member union is small. The International is free to seek relief from the Board in the future if its fears concerning the true nature of the AOA prove well founded; while this

does not justify the cancellation of the subpoena, it substantially lessens the impact of that error in the present case.

We have considered the other points raised by Petitioners and find them without merit. The order of the Board is

Enforced.

Bazelon, Chief Judge, and Wright and Fahy, Circuit Judges, dissented.