WICHITA EAGLE & BEACON PUBLISHING CO., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 72-1673.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted March 29, 1973.

Decided July 2, 1973.

Gerrit H. Wormhoudt, Wichita, Kan. (Paul R. Kitch and J. Eric Engstrom, Wichita, Kan., with him on the Brief), for petitioner.

Corinna Lothar Metcalf, Atty. N. L. R. B. (Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Leonard M. Wagman, Atty., N. L. R. B., with her on the Brief), for respondent.

Before PHILLIPS, SETH and HOLLOWAY, Circuit Judges.

SETH, Circuit Judge.

Wichita Eagle & Beacon Publishing Co., Inc. petitions this court, pursuant to 29 U.S.C. § 160(f), to review and set aside an order of the National Labor Relations Board (199 NLRB No. 50). The Board cross-petitions for enforcement of its order.

The Board has found that the newspaper had engaged in unfair labor practices within the meaning of sections 8(a)(1) and (3) of the Act, by transferring employee Dorothy Wood, against her will, from the editorial page department to the Sunday magazine department because of the said Wood's union activities, and by telling employee Wood that consequences of her union membership and activity might be severe.

The record shows that the newspaper is engaged in the publishing, sale, and distribution of daily newspapers in Wichita, Kansas. In August 1970, the Wichita Newspaper Guild, affiliated with The Newspaper Guild, AFL–CIO, filed a petition with the Board seeking certification as the collective bargaining agent of the newspaper's employees. The Board conducted a hearing on the petition and issued a Decision and Direction of Election. ·In connection therewith, the Board found that two "editorial writers," Dorothy Wood and Theodore Blankenship, should be included in the bargaining unit as they did not "possess indicia of managerial employees."

The newspaper filed a request for review of the Decision and Direction of Election with the Board, limited to the inclusion of the two editorial employees in the bargaining unit, but the Board denied the request for review.

An election was conducted by the Board among the unit that it had determined was appropriate and the Union was certified as the collective bargaining agent for the bargaining unit. Contract negotiations between the newspaper and the Union were begun, and at the time of the hearing of the unfair labor practice complaint the parties had not reached a contract.

As to Mrs. Wood, the Union filed charges and a hearing was held before a trial examiner. The trial examiner found that the newspaper had violated sections 8(a)(1) and (3) of the Act by transferring Mrs. Wood from the editorial page department to the Sunday magazine department because of her union activities. He recommended that she be reinstated in the editorial page department and that she be awarded any back pay that she would have been entitled to, including increases in salary, but for her transfer. The newspaper filed exceptions to the trial examiner's Decision. The Board issued its Decision and Order, adopting the trial examiner's Decision and adopting his recommended Order.

Mrs. Wood's position prior to her transfer to the Sunday magazine department was that of an editorial writer. As the trial examiner's Decision states, the editorial page department of the newspaper consisted of three people. Charles Pearson, editor of the editorial page, was the acknowledged supervisor of the two employees in the editorial page department, Mrs. Wood and Mr. Blankenship. He was excluded from the collective bargaining unit at the representation hearing by the Board. In the words of the trial examiner, John H. Colburn, editor and publisher of the newspaper, was also part of the editorial page department "in a real but perhaps

ex officio sense." The trial examiner's Decision includes this description of the relationship of the positions:

"Normal day to day procedure, in the editorial page department, was the holding of a midmorning conference, with Colburn, Pearson, Wood and Blankenship participating. In turn, at the conference, Pearson, Wood, and Blankenship would be asked what he or she had in mind for an editorial. Wood, for instance, when thus asked, might say that she had in mind writing a piece on ecology. Colburn or Pearson might say that we had an editorial on air and water pollution last week so we will not go on ecology again at this time. That would dispose of Wood's proposal. Or, for instance, Colburn might have responded to Wood's proposal in the following vein: What particular aspect of ecology do you have in mind; Wood would respond, with some details and elaboration; the matter would then be discussed by those present; Colburn might then say to Wood, all right, give it a try. On some other subject thus raised, Colburn might make it clear that there were certain specific things that he wished to be stated in the particular proposed editorial, e. g., the theme of the editorial should be that, on balance, after weighing the arguments pro and con, the Government should proceed with the development of the supersonic transport plane because of the need to maintain leadership in the field of air transportation and because of the need to maintain a viable aerospace industry and the tens of thousands of jobs involved in that and in satellite industries. The editorial writer would follow such a directive.

"Following the foregoing type of daily conference with Colburn, Pearson, Wood, and Blankenship would return to their offices. They would then get together in Pearson's office and discuss at greater length topics that had received tentative approval at the conference with Colburn. Views and possibly conflicting contentions would be exchanged and argued. In most instances it would be at this tripartite conference that definite editorial topics would be assigned by Pearson, to Wood, Blankenship or himself.

"After a writer drafted or wrote an editorial, it was then submitted to Pearson. He might approve it, disapprove it, or prescribe changes or revision. If the editorial cleared Pearson, it would then go to Colburn. Again, the editorial might be approved, rejected, or rejected subject to some particular revision being made." Trial Examiner's Decision, Findings and Conclusions.

Whenever a particular member of the editorial department was assigned a topic which he or she felt unable to write upon, either for reasons of personal conviction or otherwise, upon request the writer would be excused from the assignment. However, as the trial examiner found, ". . . every witness in this case, including Wood, agrees that the editorials of the newspaper function as the voice of [the newspaper's] ownership and management. What appears in an editorial is the subjective viewpoint of management." Trial Examiner's Decision, Findings and Conclusions.

Petitioner newspaper contends that editorial writers have the essential characteristics of managerial and confidential employees and therefore the two editorial writers in question, Mrs. Wood and Mr. Blankenship, were improperly included in the collective bargaining unit to begin with, and the newspaper's action in transferring Mrs. Wood was not properly subject to the Act's coverage. On the particular facts of this case, as brought out in the trial examiner's Decision and from an extensive reading of the record, we agree.

We recognize that the task of determining the application of the term "employee" ". . . has been assigned primarily to the agency created by Congress to administer the Act." NLRB v. Hearst Publications, Inc., 322 U.S. 111,

64 S.Ct. 851, 88 L.Ed. 1170; Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341. The courts, however, ". . . have never immunized Board judgments from judicial review in this respect." Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co. The court said in NLRB v. North Arkansas Electric Cooperative, Inc., 412 F.2d 324 (8th Cir.) :

> "The term 'managerial employee' is not used in the National Labor Relations Act, nor is provision made in the Act for the inclusion or exclusion of such employees in bargaining units. The Act is silent as to whether this type of employee is entitled to the protection of the Act for union activities or membership. The Board, however, has long followed the practice of excluding employees, designated as 'managerial,' from bargaining units in representation elections. It does so on the premise that certain non-supervisory employees are so closely allied with management that they should be excluded from employee bargaining units."

Although the Board considers editorial writers such as Mrs. Wood to be employees within the meaning of the Act, A. S. Abell Co., 81 NLRB 82, 83 (1949), and there does seem to be some language in the case of Associated Press v. NLRB, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953, which could support this position, a closer reading of the latter case in view of its facts leads us to another conclusion.

Associated Press dealt not with a person who was actively engaged in the "formulating, determining and effectuating" of the employer's policies. Illinois State Journal-Register, Inc. v. NLRB, 412 F.2d 37 (7th Cir.); Retail Clerks International Ass'n, AFL–CIO v. NLRB, 125 U.S.App.D.C. 63, 366 F.2d 642. Rather, that case dealt with a person who, although characterized as an "editor" or "editorial employee," was employed ". . . to determine the news value of items received and speedi-

ly and accurately to rewrite the copy delivered to [him], so that the rewritten matter [should] be delivered to the various filing editors . . . responsible for its transmission, if appropriate, to the areas reached by their circuits."

Regardless of which appellation is given to the employee in Associated Press, whether it be "editor," "editorial employee," or a member of the "news department," his position was much more akin to that of the employees in the news department of the petitioning Wichita Eagle & Beacon Publishing Co., Inc., in the instant case than to that of Mrs. Wood. The hierarchy of personnel in Associated Press was such that the aggrieved employee was responsible, in turn, to a filing editor, various "editorial employees," "supervising editors," and an "executive news editor" in the "news department" of the Associated Press.

Although Mrs. Wood was responsible to the editorial page editor, Mr. Pearson, and in turn to the editor and publisher of the newspaper, Mr. Colburn, as concerns the content and direction of the newspaper's editorials, she nevertheless was an active participant in "formulating, determining and effectuating" the newspaper's journalistic policies. The daily conferences between Colburn, Pearson, Wood, and Blankenship attest to this relationship. While subject to supervision in her writing by the editorial page editor and the editor and publisher, Mrs. Wood could, and did, propose topics for editorials, propound her own viewpoint in an effort to influence editorial policy on various subjects, and was, in sum, an integral participant in the newspaper's subjective voice, its editorials. Whether termed a managerial employee, a confidential employee, or whatever, Mrs. Wood's relationship to the newspaper and its staff placed her in a position where she was intimately involved in "formulating, determining and effectuating" her employer's policies. Illinois State Journal-Register, Inc. v. NLRB, 412 F.2d 37 (7th Cir.); Westinghouse Electric Corp. v. NLRB, 398 F.2d 669 (6th Cir.); Retail Clerks

International Ass'n, AFL–CIO v. NLRB, 125 U.S.App.D.C. 63, 366 F.2d 642.

Mrs. Wood may not have been a "Chief" (in the words of the trial examiner), but she was certainly a member of the Chief's council in the formulation of editorials. We recognize that she had no formal hand in determining wages, hours, and working conditions for employees on the newspaper, nor did she participate in such matters as basic ownership and management policies in the area of profit and loss and the like. Cf. North Arkansas Electric Cooperative, Inc., 185 NLRB No. 83 (1970), 75 LRRM 1068–69. There is, however, a distinction between the reporting of news and the creation and expression of subjective opinion on behalf of a newspaper. To hold that a person who was involved in the formulation of editorial content of a newspaper is not aligned with the newspaper's management would come perilously close to infringing upon the newspaper's First Amendment guarantee of freedom of the press.

The business of the newspaper is not immune from the Act's coverage merely because it is an agency of the press. Associated Press v. NLRB. The newspaper is not contesting the Board's determination that its news department employees are a proper collective bargaining unit and come within the Act's protections. Although the Board's ruling in this case does not have any relation to the impartial distribution of news, per se, nor to the newspaper's ability and freedom to publish the news as it desires it published (Associated Press v. NLRB), it does infringe upon the newspaper's freedom to determine the content of its editorial voice in an atmosphere of free discussion and exchange of ideas.

We therefore reject the Board's determination that the two editorial writers, Mrs. Wood and Mr. Blankenship, were "employees" under the National Labor Relations Act. Rather, we hold that they were so closely aligned with the newspaper's management in the formulation, determination, and effectuation,

not to mention expression, of the newspaper management's policies through its editorials as to be properly excluded from the collective bargaining unit of news department employees.

As the Supreme Court has noted:

". . . [I]n the normal course of events Board orders in certification proceedings under § 9(c) are not directly reviewable in the courts. This Court held as long ago as American Federation of Labor v. Labor Board, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347, that the 'final order[s]' made reviewable by §§ 10(e) and (f) in the Courts of Appeals do not include Board decisions in certification proceedings. Such decisions, rather, are normally reviewable only where the dispute concerning the correctness of the certification eventuates in a finding by the Board that an unfair labor practice has been committed as, for example, where an employer refuses to bargain . . . In such a case, § 9(d) of the Act makes full provision for judicial review of the underlying certification order by providing that 'such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed' in the Court of Appeals."

Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849. See also Magnesium Casting Co. v. NLRB, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735. This is the situation in this case. The newspaper has duly filed objections to and requests for review of the collective bargaining unit determination at every step in this controversy. On the facts here present we find that the Board's Decision and Order are not supported by "substantial evidence on the record considered as a whole." National Labor Relations Act, § 10(e), 29 U.S.C. § 160(e). Accordingly, the petition for review is granted, and the Decision and Order of the National Labor Relations Board, filed September 29, 1972, is vacated.