NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

NORTH ARKANSAS ELECTRIC COOP-
ERATIVE, INC., Respondent.

No. 19437.

United States Court of Appeals,
Eighth Circuit.

Aug. 12, 1971.

Elliott Moore, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Richard S. Robin, William J. Avrutis, Attys., N. L. R. B., for petitioner.

Gaines N. Houston, Little Rock, Ark., for respondent.

Before VAN OOSTERHOUT, HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order requiring reinstatement of Jack Lenox, a North Arkansas Electric Cooperative, Inc. managerial employee, on the grounds that North Arkansas violated § 8(a) (1) and (3) of the National Labor Relations Act by discharging Lenox for failing to remain neutral during a union organizational campaign. We deny enforcement.

This case was before us in 1969, N. L. R. B. v. North Arkansas Electric Cooperative, Inc., 412 F.2d 324 (8th Cir. 1969), at which time it was remanded to the Board for a determination of "whether or not the discharge of Lenox, as a 'managerial employee' under all the circumstances of the case, was or was not violative of the Act." *Id.* at 328. We held that the Board's determination that Lenox was not a "managerial employee" was in error, but instructed the Board to determine on remand "whether an employer has a right to discharge a 'managerial employee' for expressing favorable opinions of a union during the course of a representation election." *Id.* at 325. On remand the Board determined that even though Lenox was a "managerial employee" he was nevertheless an "employee" as defined in § 2(3) of the Act and again seeks enforcement of its order. North Ark. Electric Coop., 185 N.L.R.B. No. 83, 75 L.R.R.M. 1068 (1970).

In this Court's prior decision, the facts relating to Lenox's employment were carefully set forth by Judge Heaney as follows:

"Lenox was one of two electrification advisors employed by this rural electrification cooperative. He scheduled his own time and activities. He was treated as part of management as far as wages and benefits. He was paid on a monthly basis like other management personnel; he received no extra pay for overtime; and, he was carried on the insurance program of management. He actively participated with other management personnel in semi-annual meetings; the purpose of which was to plan new programs and secure new customers. He assisted in conducting employee training sessions.

"Lenox served as a spokesman for the cooperative in the rural communities within the district in which he was stationed. He attended numerous meetings and made frequent speeches on behalf of it. He prepared and placed advertising material on the radio, in newspapers and other publications. While most of the prepared advertisements were of an institutional nature, Lenox not only determined when they would be placed but, on frequent occasions, designed the advertising to meet competitive problems with other fuels. Compare, A. S. Abell Company, 81 N.L.R.B. No. 16, 23 L.R.R.M. 1298 (1949), where editorial writers in a large newspaper were deemed not to be 'managerial employees.'

"Lenox was manager of the Arkansas Adequate Wiring Bureau, of which North Arkansas was a member. He inspected and certified wiring in homes or buildings. He determined whether the customers could qualify for all-electric rates and adjusted customer complaints.

"Lenox was excluded from the bargaining unit at the time of the representation election by agreement between the company and the union. While neither the Board nor this Court are bound by the understanding between the parties, the fact that he was excluded in indicative of the view that was taken of his job by those in a position to closely observe what he did.

"In summary, we believe that the record amply demonstrates that Lenox exercised discretion in the performance of his duties and that the nature of his responsibilities were such as to

closely ally him with management."
N. L. R. B. v. North Arkansas Electric Cooperative, Inc., *supra*, at 327–328.

The opinion then set forth the conclusion of our Court:

"We are also convinced, from a review of the decided cases, that had this issue been presented to the Board in the context of a representation election that the Board would have excluded Lenox as a 'managerial employee.' Fresno Auto Auction, Inc., 167 N.L.R.B. No. 124, 66 L.R.R.M. 1177 (1967); Gulf States Telephone Co., 118 N.L.R.B. No. 141, 40 L.R.R.M. 1309 (1957); General Telephone Company of Ohio, 112 N.L.R.B. No. 152, 36 L.R.R.M. 1178 (1955). It cannot, irrespective of the illegality or unfairness of the discharge, be permitted to reach a different result because the question is presented in the context of an unfair labor practice." *Id.* at 328.

The only question presented to the Board upon remand was whether as a "managerial employee" Lenox was protected from discharge for failing to remain neutral in a union representation election by § 8(a) (3) and (1) of the Act.[1] The sole question presented to us in this application for enforcement is the correctness of the Board's decision that Lenox was so protected.

Subsection (3) of 29 U.S.C.A. § 152, defines "employee" as used in the Act; subsection (11) defines "supervisor."[2]

Both prior and subsequent to the 1947 amendment, there were many decisions of the NLRB which indicated that the Board considered managerial employees excluded from the coverage of the Act.

This was acknowledged by the brief of the General Counsel for the NLRB in the first application for enforcement:

"While the Act makes no specific provision for 'managerial employees',

---

1. 29 U.S.C.A. § 158(a) (1) and (3) provide in pertinent part as follows:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*"

29 U.S.C.A. § 157 provides as follows:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

2. Subsections (3) and (11) provide as follows:

"(3) The term 'employee' shall include any employee, and shall not be limited to the employees of particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined."

"(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

*the Board has long held this category of personnel to be excluded from the protection of the Act.* Thus, early in the administration of the Act, the Board initiated a policy, which continues to this date, of excluding from bargaining units of rank-and-file workers, to whom Congress intended to accord the right of self-organization, those individuals who formulate, determine, and effectuate management policies.[9] This exclusionary practice

9. Ford Motor Company, 66 NLRB 1317, 1322 (1946); Palace Laundry Dry Cleaning Corp., 75 NLRB 320, 323, n. 4 (1947); Transit Casualty Company, 83 NLRB 857, 859 (1949); American Broadcasting Company, 107 NLRB 74, 79 (1953); Swift and Company, 115 NLRB 752, 753–754 (1956); AFL–CIO, 120 NLRB 969, 973 (1958); Eastern Camera and Photo Corp., 140 NLRB 569, 571 (1963). This exclusionary policy has been approved by the courts. See, for example, Retail Clerks International Ass'n, AFL–CIO v. N.L.R.B. [125 U.S.App.D.C. 63], 366 F.2d 642 (C.A.D.C., 1966), cert. denied, 386 U.S. 1017 [87 S.Ct. 1373, 18 L.Ed.2d 455]; Amalgamated Meat Cutters [etc.] v. N.L.R.B. [99 U.S. App.D.C. 24], 237 F.2d 20, 27 (C.A. D.C.1956), cert. denied, 352 U.S. 1015 [77 S.Ct. 556, 1 L.Ed.2d 545]; International Ladies' Garment Workers' Union v. N.L.R.B., 339 F.2d 116, 123 (C. A. 2, 1964); N.L.R.B. v. Swift and Company, 292 F.2d 561, 563–564 (C.A. 1, 1961); N.L.R.B. v. Armour and Company, 154 F.2d 570, 574 (C.A. 10, 1946), cert. denied, 329 U.S. 732 [67 S.Ct. 92, 91 L.Ed. 633]." Brief for Petitioner at 9010, 412 F.2d 324 (8th Cir. 1969).

rests on the premise that the functions and interests of such individuals are more closely allied with those of management than with production workers, and therefore, that they are not truly 'employees' within the meaning of Section 2(3) of the Act, as read in conjunction with Section 2(2). See, Retail Clerks International [Ass'n] v. N. L. R. B. [125 U.S.App.D.C. 63], 366 F.2d 642, 645 (C.A.D.C., 1966), cert. denied 386 U.S. 1017 [87 S.Ct. 1373, 18 L.Ed.2d 455]. (Emphasis supplied.)

In determining whether the NLRB in its second decision on this case was correct in reversing its admittedly "long held" position that managerial employees are "excluded from the protection of the Act," we turn to the legislative history of the Labor-Management Relations Act of 1947.

Prior to the 1947 amendments, the NLRB had interpreted the word "employee" to include supervisors and one purpose of the amendments was to exclude supervisors from the coverage of the Act.

The House bill amending the National Labor Relations Act in 1947 (H.R. 3020) contained language defining those to be excluded from the definition of "employees" which was different from the Senate version. The conference report submitted to the Senate by Senator Taft contained the following statement:

"Supervisors: Both the House bill and the Senate amendment excluded supervisors from the individuals deemed to be employees for the purposes of the act. There was a sharp divergence between the House and Senate, however, with respect to the occupational groups which fell within this definition. The Senate amendment, which the conference ultimately adopted, is limited to bona fide supervisors. The House, had included numerous other classes. There were generally (A) certain personnel who fix the amount of wages earned by other employees, such as inspectors, checkers, weighmasters, and time-study personnel (B) labor relations personnel, police, and claims personnel, and (C) confidential employees. The Senate amendment confined the definition of supervisor to individuals generally regarded as foremen and employees of like or higher rank.

"In the case of persons working in labor relations personnel and employment divisions, it was not thought necessary to make specific provision, as was done in the House bill, since the Board had treated, and presumably

will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect. The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, most time-study employees are professional personnel, the special provisions of the Senate amendment applicable with respect to professional employees will cover this category. In the case of guards, the conference agreement does not permit the certification of a labor organization as the bargaining representative of guards if it admits to membership, or is affiliated with any organization that admits to membership, employees other than guards. The provision dealing with the certification of bargaining units for guards is dealt with in section 9(b) of the conference agreement, and the individuals who are to be considered as guards are described." 93 Cong.Rec. 6442 (1947).

As mentioned indirectly in the conference report, there was also included in the House bill (H.R. 3020) the following definition of "supervisor":

"(12) The term 'supervisor' means any individual—

\* \* \*

(C) who by the nature of his duties is given by the employer information that is of a confidential nature, and that is not available to the public, to competitors, or to employees generally, for use in the interest of the employer." 1 National Labor Relations Board, Legislative History of the Labor-Management Relations Act, 1947, at 167–168 (1948).

House Report No. 245 on this section includes the following statement:

"(12) 'Supervisor': In the discussion of the definition of the term 'employee,' the reasons for excluding from that definition persons who act for employers in the employer's dealings with labor have been fully set forth. The substantive language of section 2 (12) of the present bill is consistent with that of the Case bill, which passed Congress last year. The only important change concerns confidential employees. These are people who receive from their employers information that not only is confidential but also that is not available to the public, or to competitors, or to employees generally. *Most of the people who would qualify as 'confidential' employees are executives and are excluded from the act in any event.*

"The Board, itself, normally excludes from bargaining units confidential clerks and secretaries to such people as these. But protecting confidential financial information from competitors and speculators, protecting secret processes and experiments from competitors, and protecting other vital secrets ought not to rest in the administrative discretion of the Board or on the responsibility of whatever union happens to represent the employees. *The bill therefore excludes from the definition of employees persons holding positions of trust and confidence whose duties give them secret information.* The bill does not forbid these people to organize. It merely leaves their organizing and bargaining activities outside the provisions of the act." (Emphasis supplied.) *Id.* at 314.

This indicates that the House committee at that time considered "executives" excluded from the coverage of the Act.

In a case decided since the submission of this case, N. L. R. B. v. Wheeling Electric Company, 444 F.2d 783 (4th Cir. 1971), that Court determined that a confidential secretary was not an employee under the Act and refused to enforce an order of the NLRB ordering her reinstated after she was fired for refusing to work during a strike. In reaching its decision, the Court relied upon the Sen-

ate-House conference report cited above and stated as follows:

"We think the Congress was aware of and correctly interpreted prior Board decisions and practice. Although we may not rewrite a statute nor incorporate in it the provisions of a conference report, we are free to interpret the word 'supervisor' in light of legislative history. '[W]hen the reason given for not changing [a law] is that the evil adverted to can be dealt with adequately under existing law, this may be considered by the courts in interpreting a doubtful provision of existing law.' Pridemark, Inc. v. Commissioner, *supra* [345 F.2d 35], at 41, n. 5. On the basis of clear legislative intent we hold that 'supervisors' within the context of the statute included confidential secretaries so as to leave their concerted activity for the benefit of rank-and-file employees unprotected by the Act."

The Court also noted:

"The cardinal rule of statutory construction is that the intent of the legislative assembly is to be given effect. Usually, that intent may be found in the statute itself. But statutes are 'contextual as well as textual,' Argosy Limited v. Hennigan, 404 F.2d 14, 20 (5th Cir. 1968), and where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, District of Columbia v. Orleans, 132 U.S.App.D.C. 139, 406 F.2d 957, 958 (1968), or produces an absurd result, United States v. American Trucking Assns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), courts must look beyond the plain words of the statute. See, Salt River Project [etc.] v. FPC, 129 U.S. App.D.C. 117, 391 F.2d 470 (1968).

'Statutes * * * are not inert exercises in literary composition. They are instruments of government, and in construing them "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." ' (Frankfurter, J., speaking for the Court) (citations omitted). United States v. Shirey, 359 U.S. 255, 260–261, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959).

'It is a familiar maxim of statutory interpretation that courts should enforce a statute in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation.'

Haberman v. Finch, 418 F.2d 664, 666 (2d Cir. 1969)." Id. at 786–787.

■ While not controlling, the Court is entitled to give considerable weight to the construction of a statute by the administrative agency entrusted with its execution when that statute has been subsequently considered by Congress and not materially amended.[3] This is especially true here where Congress enacted an amendment excluding supervisors from coverage after they had been included by Board interpretation but did not make reference to "managerial employees" who had not been so included.

It is apparent that in passing the Labor-Management Relations Act of 1947, Congress understood that persons working in labor relations, personnel and employment divisions and as confidential employees had theretofore been treated as "outside the scope of the Act," and that it was the intention of the conferees this practice be continued under the 1947 amendments.

Prior to the passage of the Labor-Management Relations Act of 1947, the

3. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 8–11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Commissioner v. Noel Estate, 380 U.S. 678, 682, 85 S.Ct. 1238, 14 L.Ed. 2d 159 (1965); NLRB v. Gullett Gin Co., 340 U.S. 361, 365–366, 71 S.Ct. 337, 95 L.Ed. 337 (1951); Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 114–115, 59 S.Ct. 423, 83 L.Ed. 536 (1939); Allison v. United States, 426 F.2d 1324, 1328 (6th Cir. 1970); Lincoln Bank & Trust Co. v. Exchange Nat'l Bank, 383 F.2d 694, 699 (10th Cir. 1967).

NLRB had held in Ford Motor Company, 66 N.L.R.B. 1317, 1322, 17 L.R.R.M. 394, 395 (1946), "[w]e have customarily excluded from bargaining units of rank and file workers executive employees who are in a position to formulate, determine and effectuate management policies. These employees we have considered and still deem to be 'managerial,' in that they express and make operative the decisions of management."

Although not specifically mentioned in the conference report, it must be assumed that Congress was also aware of this stated policy by the Board in 1947 and its failure to change the statute to specifically include managerial employees as "employees" either in 1947 or in subsequent years must be given some weight by this Court.

The Board itself indicated that its policy remained the same immediately after the passage of the 1947 Act when it stated as follows:

"The determination of 'managerial,' like the determination of 'supervisory' is to some extent necessarily a matter of the degree of authority exercised. We have in the past, and before the passage of the recent amendments to the act, recognized and defined as 'managerial' employees, executives who formulate and effectuate management policies by expressing and making operative the decisions of their employer, and have excluded such managerial employees from bargaining units. Matter of Ford Motor Company, Chicago Branch, 66 N.L.R.B. 1317 [17 LRR Man. 394]. * * *

"We believe that the Act, as amended, contemplates the continuance of this practice." Palace Laundry Dry Cleaning Corp., 75 N.L.R.B. 320, 323, 21 L.R.R.M. 1039 (1947).

Almost a decade later, in Swift & Co., 115 N.L.R.B. 752, 753–754, 37 L.R.R.M. 1391, 1392 (1956) (overruled by the Board in this case), the Board stated:

"It was the clear intent of Congress to exclude from the coverage of the Act all individuals allied with manage-

ment.[2] Such individuals cannot be

2. See Section 2(2) and (3) of the Act; 93 Cong.Rec. 6442 (1947)."

deemed to be employees for the purposes of the act.

■ In determining the intent of Congress, it is also proper to look to the expressed purpose of the Act set forth in 29 U.S.C.A. § 151, the final paragraph of which reads as follows:

"It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

■■ It seems clear from a reading of the entire section that the primary purpose of the Act was to promote the flow of commerce by encouraging the collective bargaining process including the protection of "workers" in their choice of labor organizations and representatives for bargaining purposes. Nothing therein contained can be interpreted as evidence of a purpose to protect employees *who are not members of any bargaining unit* and who are more closely aligned with management than they are with the members of the bargaining unit. As stated in N. L. R. B. v. Wheeling Electric Company, *supra*:

"[t]he exclusion of confidential employees from the protection of the Act is consistent with the Act's primary purpose of promoting industrial harmony through collective bargaining. 29 U.S.C. § 151. 'The purpose of federal labor legislation is to reconcile and, insofar as possible, equalize the power of competing economic forces within the society in order to encourage the making of voluntary agree-

ments governing labor-management relations and prevent industrial strife.' Pittsburgh Plate Glass Co. v. NLRB, 427 F.2d 936, 946 (6th Cir. 1970). It is obviously consistent with this purpose to exclude confidential employees from membership in ordinary representative units to prevent unfairness to the employer."

In 1966 Chief Justice (then Circuit Judge) Burger indicated his understanding of the Board's policy as to managerial employees as follows:

"The Board also excludes from the protection of the Act, as managerial employees, 'those who formulate, determine, and effectuate an employer's policies,' AFL–CIO, *supra* at 973, and those who have discretion in the performance of their jobs, but not if the discretion must conform to an employer's established policy, Eastern Camera and Photo Corp., 140 N.L.R.B. 569, 571 (1963) (store managers who could set prices are not managerial). The rationale for this Board policy, though unarticulated, seems to be the reasonable belief that Congress intended to exclude from the protection of the Act those who comprised a part of 'management' or were allied with it on the theory that they were the one from whom the workers needed protection." Retail Clerks International Ass'n v. N. L. R. B., *supra*, 366 F.2d at 645.

As stated by Judge Marshall speaking for the Second Circuit in 1964:

"Although the Act makes no special provision for 'managerial employees,' under a Board policy of long duration, this category of personnel has been excluded from the protection of the Act. See Ford Motor Co., 66 N.L.R.B. 1317 (1946); Palace Laundry Dry Cleaning Corp., 75 N.L.R.B. 320 (1947). The Board has defined 'managerial employees' as 'those who formulate, determine and effectuate an employers'

policies,' American Federation of Labor, 120 N.L.R.B. 969, 973 (1958), and while the Board's rulings on the scope of this definition are not a model of clarity, we are satisfied that, in this area at least, its policy cannot be deemed either arbitrary or in violation of the statutory language or purpose." International Ladies' Garment Workers' Union v. N. L. R. B., 339 F.2d 116, 123 (2d Cir. 1964).

In Westinghouse Electric Corporation v. N. L. R. B., 424 F.2d 1151, 1158 (7th Cir. 1970), Judge Fairchild made this statement:

"Although the act contains no exemption for 'managerial' employees, they have long been excluded from coverage as a matter of board policy. As is set forth in Illinois State Journal-Register, Inc. v. N. L. R. B., the fundamental tests to be used in determining whether an individual is such a 'managerial' employee are: (1) whether the employee is 'so closely related to or aligned with management as to place the employee in a position of potential conflict of interest between his employer on the one hand and his fellow workers on the other' and (2) 'whether the employee is formulating, determining and effectuating his employer's policies or has discretion, independent of an employer's established policy, in the performance of his duties.'" (Footnotes omitted.)

In the Board's second decision in this case, it concedes that there has been a lack of clear definition of the "managerial employee" category which it has created.[4] It indicates that an employee may not have the requisite community of interest with other employees to be included with them in a proposed unit, but still be an employee entitled to the protection of the Act as a section 2(3) "employee." We find nothing in the Act or its legislative history to indicate Congress intended the word "employee"

4. A summary of the history of the term "managerial employee" is set forth by Judge Heaney in our first decision in this case, N.L.R.B. v. North Arkansas Electric Cooperative, Inc., *supra*, 412 F.2d at 325–326.

to have one definition for the purpose of determining a proper bargaining unit and another definition for the purpose of determining which employees are protected from being fired for union activity. As stated in N. L. R. B. v. Wheeling Electric Company, *supra*:

"[i]t strikes us as nonsense for the Board to exclude Mrs. McConnell from membership in the bargaining unit and *then* extend to her the same protection for the same concerted activity that she would have enjoyed if a union member."

The Board also places reliance on the fact that "there is nothing in the record to suggest that he participated in the formulation, determination, or effectuation of policy *with respect to employee relations matters*." This assertion not only conveniently ignores our prior holding that Lenox "assisted in conducting employee training sessions," but in our view, also improperly limits the class of employees not protected by the Act.

It is clear on the one hand that members of the bargaining unit are protected from discharge for legitimate union activities, and on the other hand, supervisors, agricultural laborers, domestic servants, children of employees and independent contractors are not. The legislative history cited above, together with the logical analysis thereof in the recent *Wheeling Electric Company* case, clearly indicate that labor relations and employment division personnel and confidential employees are not intended to be protected by the Act. If none of these classes of employees is protected, it is not logical to assume that Congress intended to protect managerial employees who are so closely aligned with management as to be excluded from the bargaining unit and who had not been held to be "employees" by the Board prior to the 1947 amendments.

For the foregoing reasons, we conclude that it was not the intent of Congress to provide managerial em-

ployees with protection from being discharged for refusing to obey instructions to remain neutral in a union election, and we deny enforcement of the Board's order.