**BELL AEROSPACE COMPANY DIVISION OF TEXTRON INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 351, 352, Docket 72-1703—72-1860.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1973.

Decided Feb. 28, 1973.

Richard E. Moot, Buffalo, N. Y. (Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y., of counsel), for petitioner.

Jonathan G. Axelrod, Atty., N. L. R. B. (Peter G. Nash, General Counsel, Patrick Hardin, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Leonard M. Wagman, Atty., N. L. R. B., of counsel), for respondent.

Before FRIENDLY, Chief Judge, and OAKES and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

I.

A petition by the Bell Aerospace Company Division of Textron Inc. (Bell) to review and a cross-petition by the National Labor Relations Board to enforce a bargaining order, 187 N.L.R.B. No. 30 (1972), put in question the Board's earlier order in a representation case, 190 N.L.R.B. No. 66 (1971), adhered to on a denial of reconsideration, 196 N.L.R.B. No. 127 (1972). The representation order found that 25 buyers in Bell's Department 121 constituted an appropriate unit and directed an election, which was won by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Amalgamated Local 1286 (the Union). Bell refused to recognize the Union on the ground that the buyers were managerial employees and, as such, were not employees protected by §§ 7 and 8(a) of the National Labor Relations Act.

There is not much dispute about the facts: The buyers have full discretion, without limit in dollar amount, in selecting prospective vendors, preparing invitations to bid, evaluating bids, negotiating prices and terms, and preparing purchase orders. They execute all purchase orders up to $50,000, although they must obtain the approval of a superior for any commitment exceeding $5,000.[1] Many purchases are "off the shelf" items, which are made in quantity for the general public and can be purchased from a number of distributors or sources; many are not. In some instances other Bell employees (many of them organized) or a subcontractor will have tentatively selected a vendor, and the buyer must get approval before seeking a different one. For the Minute Man project, which represents about 70% of Bell's sales, major decisions are made by a team consisting of supervisory type personnel[2] from the engineering, quality assurance, manufacturing and finance departments; the buyer is team chairman and signs the purchase forms but a supervisor from pricing and

1. Despite this limitation, the amount of company credit which a buyer can commit on his own authority is very substantial. For one buyer this was $1,351,983 in a 19-month period; during the same period, the aggregate amount of credit committed by the buyers without higher approval was $7,671,172.

2. Supervisors are excluded from the National Labor Relations Act's definition of employee. See 29 U.S.C. § 152(3). Supervisors are defined as "having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." *Id.* § 152(11).

negotiations participates in working out the terms. Once agreement is reached, the buyer is responsible for seeing that contracts are complied with and adjusting disputes. Where the amount is less than $5,000, the buyer has authority to cancel a contract and place the order with an alternate vendor.

The case first came before the Board by transfer from the Regional Director in October, 1970. On May 20, 1971, a unanimous Board issued a direction of election, 190 N.L.R.B. No. 66, relying heavily on its recent decision in North Arkansas Electric Cooperative, Inc., 185 N.L.R.B. No. 83 (1970). *North Arkansas* concerned the discharge of one Lenox, an "electrification advisor," who had been discharged for failing to remain neutral during a union organizational campaign. On the Board's application for enforcement of an earlier order requiring reinstatement, 168 N.L.R.B. 921 (1967), the Eighth Circuit held that the Board's determination that Lenox was not a "managerial employee" was in error but remanded for determination

whether his discharge was nevertheless in violation of the National Labor Relations Act, NLRB v. North Arkansas Electric Cooperative, Inc., 412 F.2d 324 (8 Cir. 1969).[3] The Board, on remand, held that the Act's protections extended to most managerial employees in general and to Lenox in particular, North Arkansas Electric Cooperative, Inc., *supra*, 185 N.L.R.B. No. 83.[4] This disposed, as far as the Board was concerned, of what had been Bell's prime contention in the instant case, namely, that the buyers did not constitute an appropriate unit for collective bargaining within § 9(b) since they were managerial employees;[5] the Board proceeded to reject the alternative contention "that buyers, whether considered managerial or not, are to be denied representation because there would exist a potential conflict of interest between the buyers as union members and the Employer"—notably by preferring unionized vendors and influencing "make or buy" decisions in favor of "make," thus creating additional work for sister unions in the plant.[6]

3. The court, convinced that had the question of Lenox's managerial status arisen in the context of a representation proceeding, the Board, in accordance with its prior decisions, would have excluded him from the bargaining unit as a "managerial employee," said that the Board could not "irrespective of the illegality or unfairness of the discharge, be permitted to reach a different result because the question is presented in the context of unfair labor practice." 412 F.2d at 328. However, in remanding to the Board, the court left open the question whether a "managerial employee," while normally excluded from bargaining units of rank and file employees, might under some circumstances be protected from his employer's unfair labor practices. *Id.* at 325.

4. The Board's rationale was that an employee might be "managerial" insofar as he did not have "the requisite community of interest" with other employees to be included with them in a proposed unit, yet might still fall within the Act's definition of employee and therefore be entitled to its protections. At the same time, however, the Board indicated that certain categories of managerial personnel would not be considered within the definition of em-

ployee and therefore not receive any of the Act's protections—namely, those employees who participated in formulating, determining or effectuating policy with respect to employee relation matters, who had apparent authority in that area, or who had a conflict of interest between proper performance of their jobs and their right to engage in concerted activity. The Board found that Lenox did not fit into any of these categories.

In footnote 8 of its decision, the Board overruled Swift & Co., 115 N.L.R.B. 752 (1956), to the extent that it was inconsistent with its views. See discussion, *infra*.

5. Although the Board in North Arkansas Electric Cooperative, Inc., *supra*, 185 N.L. R.B. No. 83, had indicated a continued adherence to its policy of excluding managerial employees from bargaining units of rank and file personnel because of a lack of "community of interest," the Board, in the instant case, apparently felt that no such consideration opposed formation of a separate unit of buyers.

6. The decision does not make clear whether the Board regarded the buyers as managerial employees. *Footnote 2 shows that* Member Jenkins thought they weren't but

On the very day on which the Board certified the Union, the Eighth Circuit denied enforcement of the Board's second order in NLRB v. North Arkansas Electric, 446 F.2d 602 (8 Cir. 1971). On the basis of a review of the legislative history of the Taft-Hartley Act, 446 F.2d at 605–608, and of court decisions with respect to application of the Act to "managerial employees," the court held that Congress did not intend the word "employee" to embrace them.[7] No application was made for certiorari.

Predictably Bell moved for reconsideration, which the Board denied in another opinion, 196 N.L.R.B. No. 127 (1972). Disagreeing with the breadth of the Eighth Circuit's opinion, the Board restated the position it had taken in *North Arkansas*. See fn.4 *supra*. It held that managerial employees were excluded from coverage only if they make "determinations which should be made free of any conflict of interest which could arise if the person involved was a participating member of a labor organization." This category included not only "those concerned with management policies in the labor relations area," but also those having "responsibility with respect to policies which are inextricably intertwined and of necessity affect or infringe upon the labor relations area." It gave as an example "a corporate representative, charged with the duty of determining where an employer's plants should be located or what capital expenditures a corporation ought to make" if he had "broad managerial discretion." The same might be true of "those bearing primary responsibility for determination of financial policies, or even those charged with the direction of basic policies in the field of research and development." The Board emphasized that the question whether "the probabilities of such conflict are sufficiently mini-

mal" was to be determined on the facts of each case.

## II.

The issue here tendered must be considered in light of the confusing pattern of Board decisions before and after enactment of the Taft-Hartley Act in 1947, 61 Stat. 136 et seq., and the less than pellucid legislative history of the provision of that statute that is here relevant.

The concept of the "managerial employee" seems to have first arisen in National Labor Relations Act cases in which either employers or unions argued for the exclusion from proposed larger bargaining units of certain employees with a close relationship to management. In Julian P. Friez & Sons, 47 N.L.R.B. 43, 47 (1943), the Board ruled that employees, who were charged with expediting the completion of orders and assuring adherence to production time schedules, were "closely related to the management," and therefore should be excluded from a unit of production and maintenance employees. Expediters, who contacted vendors, placed orders, kept records of the progress of deliveries and had authority to reassign orders, were excluded from a unit of office, clerical, technical and professional employees in Spicer Manufacturing Corp., 55 N.L.R.B. 1491, 1498 (1944), because "the authority possessed by these employees to exercise their discretion in making commitments on behalf of the Company stamps them as managerial." See also Rex Manufacturing Co., Inc., 7 N.L.R.B. 95, 99 (1938); Westinghouse Air Brake Co., 64 N.L.R.B. 547, 553 (1945); Electric Controller & Manufacturing Co., 69 N.L.R.B. 1242, 1245–1246 (1946). In a number of cases this principle was applied to buyers. See, *e. g.*, Hudson Motor Car Co., 55 N.L.R.B. 509, 512 (1944); Vulcan Corp., 58 N.L.R.B.

---

Member Kennedy thought they were. Footnote 3 indicates that the three other members also thought the latter.

7. The court rejected the Board's attempt to reformulate the definition of "managerial employee," and decried any no-

tion that an employee could be considered within the Act's definition of "employee" for the purpose of being protected from firing by his employer for participating in union activity but not for the purpose of organization in a proper bargaining unit. 446 F.2d at 609–610; see n. 4 *supra*.

733, 736 (1944); Barrett Division Allied Chem. & Dye Corp., 65 N.L.R.B. 903, 905 (1946). Shortly before enactment of the Taft-Hartley amendments, the Board summed up its position as regards "managerial employees" in Ford Motor Co., 66 N.L.R.B. 1317, 1322 (1946) (footnote omitted):

> We have customarily excluded from bargaining units of rank and file workers executive employees who are in a position to formulate, determine, and effectuate management policies. These employees we have considered and still deem to be "managerial," in that they express and make operative the decisions of management.

While the Board's policy was clearly not to permit managerial employees to join units of rank and file personnel, the Board nonetheless viewed at least minor managerial employees as within the Act's definition of "employee." In an early decision, the NLRB, holding that a dispatcher was an "employee" and therefore protected by the Act against his employer's unfair labor practices, said:

> [The employee's] position as dispatcher . . . was of a minor supervisory character. Although antiunion conduct of managerial or supervisory employees has been repeatedly held to be proof that the employer has engaged in unfair labor practices, it does not follow that managerial or supervisory employees are not employees within the meaning of Section 2(3) of the Act. The statutory definition is of wide comprehension.

Atlantic Greyhound Corp., 7 N.L.R.B. 1189, 1196 (1938) (footnote omitted). And in Dravo Corp., 54 N.L.R.B. 1174 (1944), a case in which the Board excluded buyers and expediters from a unit of office and clerical workers, it stated:

> Since the work of both buyers and expediters requires much greater initiative and more direct contact with outsiders, and is of a much more responsible nature than that of employees in categories which the parties

would include in the unit, we are of the opinion that it would best serve the policies and purposes of the Act to exclude the buyers and expediters from the . . . unit. *This is not to say, however that buyers and expediters are to be denied the right to self-organization and to collective bargaining under the Act.* The precise relationship of the buyers and expediters to management here is not now being determined by us.

*Id.* at 1177 (emphasis added).

The Board took a somewhat different tack in Maryland Drydock Co., 49 N.L.R.B. 733 (1943), where it found that a *separate* union of supervisory personnel would not constitute an appropriate unit for collective bargaining, although still insisting that a supervisor was an "employee" as defined by the Act, *id.* 737–738. See Packard Motor Co., 64 N.L.R.B. 1212, 1214 (1945) (Herzog, Chairman, concurring); Packard Motor Co. v. NLRB, 330 U.S. 485, 492 n.3 (1947). Similarly, in Yale & Towne Manufacturing Co., 60 N.L.R.B. 626 (1945), overruled in other respects, Ford Motor Co., *supra,* 66 N.L.R.B. at 1322 n.12, the Board found the interests of certain time-study employees were sufficiently akin to those of management that the employees "should neither be included in a unit with other employees, *nor established as a separate unit.*" *Id.* at 628–629.

Maryland Drydock was overruled in Packard Motor Co., 61 N.L.R.B. 4, 64 N.L.R.B. 1212 (1945), and the Board's decision that foremen were "employees" whom the Act entitled to form their own union was approved by the Supreme Court, Packard Motor Co. v. NLRB, *supra,* 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040, aff'g 157 F.2d 80 (6 Cir. 1946). Since an important purpose of Congress in passing the Taft-Hartley amendments was to overturn that decision, see H.R. Rep.No.245, 80th Cong., 1st Sess. 13–14, 17 (1947) and S.Rep.No.105, 80th Cong., 1st Sess. 3–5 (1947), the dissenting opinion in *Packard* is more than ordinarily important. Mr. Justice Douglas,

joined by Chief Justice Vinson and Justice Burton, there wrote, 330 U.S. at 494, 67 S.Ct. at 794:

> For if foremen are "employees" within the meaning of the National Labor Relations Act, so are vice-presidents, managers, assistant managers, superintendents, assistant superintendents —indeed, all who are on the payroll of the company, including the president; all who are commonly referred to as the management, with the exception of the directors. If a union of vice-presidents applied for recognition as a collective bargaining agency, I do not see how we could deny it and yet allow the present application.

Arguing that, when Congress desired to include supervisory personnel in a category of employees, it knew how to do so, he called attention to other statutes *in pari materia* which, unlike the National Labor Relations Act, defined "employee" to include a "subordinate official," Railway Labor Act of 1926, 44 Stat. 577; Merchant Marine Act of 1936, 52 Stat. 953, 966.

As indicated, the introduction of H.R.3020 in 1947 represented, in part, a reaction to the holdings in the *Packard Motor Co.* decisions that supervisory personnel constituted an appropriate unit for collective bargaining. The Bill excluded from the definition of employees not only those traditionally defined by the Board as supervisors, namely, those employees with power to hire, transfer, promote, discharge, reward, or discipline other employees, or to effectively recommend such action, see Ford Motor Co., 66 N.L.R.B. 1317, 1325 (1946) and S.Rep.No.105, *supra,* at 4, but also (1) personnel who fix or make effective recommendations with respect to the amount of wages earned by other employees, and those who make effective recommendations with respect to the application of factors upon which wages are determined, (2) labor relations, time-study, police and guard personnel, and (3) confidential employees. The Bill defined the latter as any employee "who by the nature of his duties is given by the employer information that is of a confidential nature, and that is not available to the public, to competitors, or to employees generally, for use in the interest of the employer." The Committee Report accompanying the bill expressed concern over evidence that in those plants where foremen had been permitted to organize, more work stoppages occurred and productivity dropped. H.R.Rep.No.245, *supra,* at 14–15.

The definition of supervisor contained in the Senate bill, S.1126, was more narrowly drawn, paralleling that which had been established by the Board:

> The term "supervisor" means any individual having authority, in the interest of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or to adjust their grievances, or effectively to recommend such action if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

But while the Senate Committee was concerned with distinguishing between supervisors vested with "genuine management prerogatives," such as the power to hire, fire, or discipline other employees, and minor supervisors such as "straw bosses, leadmen, [and] set-up men," it expressed the same concerns that had been voiced by the House Committee over the granting of the Act's protections to supervisory personnel. S.Rep.No.105, *supra,* at 4–5. The Senate Committee felt that the organization of supervisors had upset the balance of power between labor and management, *id.* at 3, and it wished to prevent conflicts of interest, resulting in lower productivity, less discipline, and a correspondingly higher industrial accident rate, *id.* at 4–5. The Committee's Report, S.Rep.No.105, *supra,* at 4, also reflected a desire to prevent the possibility, mentioned in Justice Douglas' dissent in Packard Motor Co. v. NLRB, *supra,* 330 U.S. at 494, 67 S.Ct. 789, 91 L.Ed.

1040, that the Supreme Court's reasoning in that case could be used to justify the unionization of vice-presidents.

The Conference Committee agreed to accept the Senate's definition of supervisors.[8] With reference to those additional employees who had been included within the House but not within the Senate definition, the Report stated:

> In the case of persons working in the labor relations, personnel and employment departments, it was not thought necessary to make specific provision, as was done in the House bill, since the Board has treated, and presumably will continue to treat, such persons as outside the scope of the act. This is the prevailing Board practice with respect to such people as confidential secretaries as well, and it was not the intention of the conferees to alter this practice in any respect. The conference agreement does not treat time-study personnel or guards as supervisors, as did the House bill. Since, however, time-study employees may qualify as professional personnel, the special provisions of the Senate amendment (hereafter discussed) applicable with respect to professional employees will cover many in this cat-

egory. In the case of guards, the conference agreement does not permit the certification of a labor organization as the bargaining representative of guards if it admits to membership, or is affiliated with any organization that admits to membership, employees other than guards.

H.R.Conf.Rep.No.510, 80th Cong., 1st Sess. 35–36 (1947).[9]

The best we can make of this history is as follows: The Senate had been persuaded that the House definition would have barred from the protection of the Act too many people who should be within it. But neither the Senate, nor the House in yielding to it, thought the exclusion would be limited to persons precisely fitting the Act's definition of "supervisor." It is quite clear—and the Board does not challenge this—that Congress believed "persons working in the labor relations, personnel and employment departments" would be excluded. However, our sense of the situation is that Congress recognized there were other persons so much more clearly "managerial" that it was inconceivable that the Board would treat them as employees. Surely Congress could not have supposed that, while "confidential secre-

8. The definition contained in S. 1126 had been modified slightly by the Senate. The Senate agreed to an amendment proposed by Senator Flanders which added the phrase "or responsibly to direct them." See 93 Cong.Rec. 4677–4678 (1947); n. 2 *supra*.

The Senate had rejected an amendment to S. 1126, proposed by Senator Langer, that would have replaced the "supervisor" exclusion with an exclusion for "an assistant superintendent or superintendent, or any individual occupying a higher supervisory status than assistant superintendent." 93 Cong.Rec. 5117 (1947). A superintendent would have been defined as "any individual who, within power directly delegated by an owner, president, or board of directors, directs, controls, and administers a specific institution, plant, or function and is responsible for the successful outcome of the undertaking, and who works through assistants or subordinate foremen," and "assistant

superintendent" as "any individual having authority to regularly assist a superintendent by performing essentially the same duties as the superintendent." *Id.* Although this definition of superintendent bears some resemblance to the definition of "managerial employee" that has been developed by the Board, the Senate's rejection of this amendment should not be viewed as a rejection of the managerial employee exception. Since the effect of this amendment would have been to permit employees of supervisory status lower than assistant superintendents, such as foremen, to organize, rejection of this amendment is more easily explained by a desire to expand the definition of supervisor to include employees such as foremen than by a desire to treat superintendents and their assistants as employees. See 93 Cong.Rec. 5116 (remarks of Sen. Taft opposing the proposed amendment).

9. The report was submitted to both houses. 93 Cong.Rec. 6361, 6434 (1947).

taries" could not be organized, their bosses could be.[10] In other words, Congress failed to enact the portion of Mr. Justice Douglas' *Packard* dissent relating to the organization of executives, not because it disagreed but because it deemed this unnecessary.

After passage of the Taft-Hartley amendments, the Board at first continued its previous practice of simply excluding "managerial employees" from units of rank and file employees. For example, in Denver Dry Goods Co., 74 N.L.R.B. 1167 (1947), assistant buyers, who were required to set good sales records as examples to other employees, assist buyers in various matters such as the selection of merchandise, and take over the buyers' duties when the latter were absent, were excluded from a unit of sales, clerical and office employees, because their interests were "more closely identified with those of management." The Board stated its policy in Palace Laundry Dry Cleaning Corp., 75 N.L.R.B. 320, 323 n.4 (1947), a case in which the Board refused to exclude store managers from a store-wide bargaining unit because they were neither managerial nor supervisory employees:

> We have in the past, and before the passage of the recent amendments to the Act, recognized and defined as "managerial" employees, executives who formulate and effectuate management policies by expressing and making operative the decisions of their employer, and have excluded such managerial employees from bargaining units. . . . We believe the Act, as amended, contemplates the continuance of this practice.

The same policy was followed with respect to buyers in Denton's Inc., 83 N.L.R.B. 35, 37 (1949).

In the 1950's the Board went further. In American Locomotive Co., 92 N.L.R.B. 115 (1950), a case in which buyers were excluded from an office and clerical unit because they were authorized to negotiate for credit and to make substantial purchases for their employer, the Board said that, since they were managerial employees, the buyers could "not be accorded bargaining rights under the Act." *Id.* at 117. Then in 1956, the Board, finding a separate unit of procurement drivers, who kept supplies of produce coming into their employer's plant and exercised discretion in meeting competitors' prices, to be an inappropriate unit for collective bargaining because their interests were "allied with management," Swift & Co., 115 N.L.R.B. 752, stated:

> It was the clear intent of Congress to exclude from the coverage of the Act all individuals allied with management. Such individuals cannot be deemed to be employees for the purposes of the Act.

*Id.* at 753–754 (footnote omitted).[11]

---

10. We think that when the Conference Report referred to "confidential secretaries," it used that term with the same meaning which H.R. 3020, as reported, had spelled out for "confidential employees," even though in 1946, the Board had narrowed its definition of confidential employees to those "who exercise 'managerial' functions in the field of labor ralations." Ford Motor Co., 66 N.L.R.B. 1317, 1322.

11. In many other cases the Board excluded buyers from units of rank-and-file employees on the ground that they were "managerial" since they could effectively commit their employer's credit. For example:

> The duties of the assistant purchasing agent and the buyer include, among others, the placing of orders for various items of supplies and equipment. It appears that they effectively bind the Employer's credit in the regular course of their work. In accordance with established Board practice, we find these employees are managerial employees, and we shall therefore exclude them from the unit.

Florence Stove Co., 98 N.L.R.B. 16, 17 (1952) (footnote omitted). See also Howard-Cooper Corp., 105 N.L.R.B. 753, 754 (1953); American Lithofold Corp., 107 N.L.R.B. 1061, 1063 (1954); Temco Aircraft Corp., 121 N.L.R.B. 1085, 1089 (1958); Weaver Motors, 123 N.L.R.B.

Such was the Board's announced understanding with respect not only to "managerial employees" generally but also to buyers specifically when Congress again extensively amended the National Labor Relations Act in 1959, 73 Stat. 519 et seq.

■■■ The effect to be given such a history is a delicate and difficult question. *Cf.* Francis v. Southern Pacific Co., 333 U.S. 445, 450, 68 S.Ct. 611, 92 L.Ed. 798 (1948). Viewing more than thirty years of failure by the Federal Trade Commission to assert power over intrastate acts of unfair competition because of their adverse effect on interstate commerce, the Court refused, in FTC v. Bunte Brothers, Inc., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881 (1941), to sanction any such power, despite the famous contrary precedent with respect to the Interstate Commerce Commission in the Shreveport Case, [Houston East and West Texas R. Co. v. United States], 234 U.S. 342, 58 L.Ed. 1341 (1914). Mr. Justice Frankfurter wrote, 312 U.S. at 352, 61 S.Ct. at 582:

> Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise. But just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.

On the other hand, again speaking for the Court, the same Justice said, in NLRB v. Seven-Up Bottling Co. of Miami, Inc., 344 U.S. 344, 351–352, 73 S.Ct.

287, 291, 97 L.Ed. 377 (1953), with respect to a post-Taft-Hartley change, in F. W. Woolworth Co., 90 N.L.R.B. 289 (1950), in the method of computing back pay:

> Assuming Congress was aware of the Board's pre-*Woolworth* practice of calculating back pay on the basis of the entire period from discharge to offer of reinstatement, we could say here, as we did in Gullett Gin Co. v. N.L.R. B., [340 U.S. 361, 366, 71 S.Ct. 337, 95 L.Ed. 337 (1951)] that Congress by its reenactment indicated its agreement that the Board's practice was authorized. That leads us nowhere on the present issue, though it is only this far that what we said in *Gullett Gin* can lead us. In that case as here, again assuming notice, if Congress was satisfied that the Board was acting within its powers, the thing for it to do was what it did—reenact without change. In that case as here—though, of course, we had no occasion to say so in that case—if Congress had been more than satisfied with the Board's practice, if it had wanted to be certain that the Board would not in future profit by its experience, it would have had to do more than it did; it would have had to change the language of the statute so as to take from the Board the discretionary power to mould remedies suited to practical needs which we had declared the Board to have and which the Board was asserting and exercising. We cannot infer an intent to withdraw the grant of such power from what is at most a silent approval of specific exercises of it.[12]

209, 215–216 (1959); Ed's Foodland of Springfield, Inc., 159 N.L.R.B. 1256, 1260 (1966). In other cases, the Board has done this on the basis of more specific findings about the buyer's powers. See Mack Trucks, Inc., 116 N.L.R.B. 1576, 1577–1578 (1956); Kearney & Trecker Corp., 121 N.L.R.B. 817, 822 (1958); Federal Tel. and Radio Co., 120 N.L.R.B. 1652, 1653–1654 (1958); Albuquerque Division, ACF Industries, Inc., 145 N.L. R.B. 403, 414–415 (1963).

12. We are also not unmindful that it "is at best treacherous to find in Congressional silence *alone* the adoption of a controlling rule of law." Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084 (1946) (emphasis supplied), quoted in Boys Markets, Inc. v. Local 770, Retail Clerks Union, 398 U.S. 235, 241–242, 90 S.Ct. 1583, 26 L. Ed.2d 199 (1970).

Perhaps the best reconciliation of these eminently sensible although seemingly contrary approaches is that when an administrative construction has been long in effect, the agency cannot make a big change, especially after a reenactment or substantial amendment, but can make smaller ones.

■■ The conclusion we reach from all of the foregoing is this: The 1947 Congress clearly believed that at least some "managerial employees" other than "supervisors" were excluded from the protections of the Act.[13] In 1956 the Board concluded that the Congress had meant to exclude all true "managerial employees." This exclusion embraced not only an employee "so closely related to or aligned with management as to place the employee in a position of conflict of interest between his employer on the one hand and his fellow workers on the other" but also one who is "formulating, determining and effectuating his employer's policies or has discretion, independent of an employer's established policy, in the performance of his duties," Illinois State Journal-Register, Inc. v. NLRB, 412 F.2d 37, 41 (7 Cir. 1969). Both because of what we believe to have been the understanding of the 1947 Congress and because the Board's interpretation of it had been so clearly defined for the 1959 Congress, the Board is not now free to decide the contrary. In this respect we follow the illuminating opinion of Judge Craven, dealing with a confidential secretary, in NLRB v. Wheeling Electric Co., 444 F. 2d 783 (4 Cir. 1971), and the Eighth Circuit's decision in North Arkansas Electric, *supra*, 446 F.2d 602, although we do not agree with everything said in the latter case. On the other hand, despite the series of decisions, see fn.11, typified by Swift & Co., *supra*, 115 N. L.R.B. 752, we do not think the Board would be precluded, on proper proceedings, from determining that buyers, or some types of buyers, are not true "managerial employees" and consequently come within the protection of § 8(a)(5) and (1).

### III.

■ It might seem that this conclusion would lead to the grant of enforcement here, since there was substantial evidence that Bell's buyers were not sufficiently high in the hierarchy to constitute "managerial employees," as that term has been defined not only in Illinois State Journal-Register v. NLRB, *supra*, but also in such other cases as International Ladies' Garment Workers' Union v. NLRB, 339 F.2d 116, 123 (2 Cir. 1964) (Marshall, J.); Retail Clerks International Association v. NLRB, 125 U.S.App.D.C. 63, 366 F.2d 642, 644–645 (1966), cert. denied, 386 U.S. 1017, 87 S. Ct. 1373, 18 L.Ed.2d 455 (1967) (Burger, J.); and Westinghouse Electric Corp. v. NLRB, 424 F.2d 1151, 1158 (7 Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970) (Fairchild, J.). See also Continental Ins. Co. v. NLRB, 409 F.2d 727, 730 (2 Cir.), cert. denied, 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969). It does not, for two reasons:

The first is that we cannot be sure that the Board's decision rested on such a factual determination rather than on its new and, in our view, erroneous holding that it was free to regard *all* managerial employees as covered by the Act

---

13. Congress may have misapprehended the Board's pre-1947 practice with regard to confidential employees. As indicated in the case cited in fn. 10, the Board had apparently excluded such employees from bargaining units of rank and file personnel but had not ruled that they were unprotected by the Act. Thus, when the Conference Committee stated that the Board had treated these employees "as outside the scope of the act," it may have been in error. Nevertheless, since Congress' reason for not expanding the definition of supervisor was its belief that existing Board practices made this unnecessary, that intent should be given effect. See NLRB v. Wheeling Elec. Co., 444 F.2d 783 (4 Cir. 1971).

unless their duties met the "fundamental touchstone" of including "determinations which should be made free of any conflict of interest which could arise if the person involved was a participating member of a labor organization," see fn.6 *supra*. This requires reversal and remand under the first decision in SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S. Ct. 454, 87 L.Ed. 626 (1943), recently reaffirmed in FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 249, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).

■ The second is that, while the Board was not precluded from reversing itself on the position that buyers, or some buyers, were not "managerial employees," we hold that, particularly in light of the justified contrary belief the Board had engendered, it could not do this in the manner that was done here. This is an appropriate case in which to give effect to the Supreme Court's observation in the second *Chenery* decision, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), largely disregarded by the Board for a quarter century:[14]

> The function of filling in the interstices of the Act should be performed, as must as possible, through this quasi-legislative promulgation of rules to be applied in the future.

Such a holding is also in line with the considered dicta in NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

Although the precise issues in *Wyman-Gordon* were whether a direction made in a previous decision, Excelsior Underwear Inc., 156 N.L.R.B. 1236 (1966), that was to apply prospectively only, in fact constituted rule-making, which, if such, clearly had not been accomplished as provided in section 4 of the APA, and, if so, whether this invalidated an order, based on the prior decision, in a subsequent adjudicative proceeding, expressions by a majority of the Justices point against the procedure the Board followed here. The plurality opinion of Mr. Justice Fortas, joined by the Chief Justice, Mr. Justice Stewart and Mr. Justice White, emphasized, 394 U.S. at 764, 89 S.Ct. at 1429:

> The rule-making provisions of that Act, which the Board would avoid, were designed to assure fairness and mature consideration of rules of general application. . . . They may not be avoided by the process of making rules in the course of adjudicatory proceedings.

Mr. Justice Douglas, dissenting from the holding that the Board's violation in *Excelsior* had been cured in *Wyman-Gordon* because the rule adopted in *Excelsior* was being applied as part of a later adjudicative order, said this, 394 U.S. at 777–779, 89 S.Ct. at 1435 (footnote omitted):

> A rule like the one in *Excelsior* is designed to fit all cases at all times. It is not particularized to special facts. It is a statement of far-reaching policy covering all future representation elections.
>
> It should therefore have been put down for the public hearing prescribed by the Act.
>
> The rule-making procedure performs important functions. It gives notice to an entire segment of society

14. At argument we asked counsel for the Board to advise us in writing whether it had ever engaged in the rule-making on substantive matters contemplated by § 4 of the Administrative Procedure Act, 5 U.S.C. § 553. In a memorandum dated February 12, 1973, counsel advised us that the Board has recently concluded one such proceeding by promulgating a standard for the exercise of jurisdiction over private colleges and universities, 35 Fed. Reg. 18370 (1970) and 29 C.F.R. § 103.1. Also in the summer of 1972 the Board published notices of proposed rule-making on the questions whether to assert jurisdiction over the horseracing and dogracing industries and over symphony orchestras and, if so, what the standard should be. 37 Fed.Reg. 14242, 16813.

of those controls or regimentation that is forthcoming. It gives an opportunity for persons affected to be heard. . . .

Agencies discover [through rule-making proceedings] that they are not always repositories of ultimate wisdom; they learn from the suggestions of outsiders and often benefit from that advice.

\* \* \* \* \* \*

I would hold the agencies governed by the rule-making procedure strictly to its requirements and not allow them to play fast and loose as the National Labor Relations Board apparently likes to do.

Mr. Justice Harlan, likewise dissenting, after pointing to the Board's decision to apply the *Excelsior* rule only prospectively as implying that it was "such a departure from pre-existing understandings that it would be unfair to impose the rule upon the parties in pending matters," 394 U.S. at 780–781, 89 S. Ct. at 1437, continued:

[I]t is precisely in these situations, in which established patterns of conduct are revolutionized, that rule-making procedures perform the vital functions that my Brother Douglas describes so well in a dissenting opinion with which I basically agree.

\* \* \* \* \* \*

Either the rule-making provisions are to be enforced or they are not. Before the Board may be permitted to adopt a rule that so significantly alters pre-existing labor-management understandings, it must be required to conduct a satisfactory rule-making proceeding, so that it will have the benefit of wide-ranging argument before it enacts its proposed solution to an important problem.

Despite all this, *Wyman-Gordon* does not supply a bright line for determining just when the Board, or other agencies, must proceed by rule-making. See Bernstein, The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act, 79 Yale L.J. 571 (1970). Certainly the decision does not proscribe the use of adjudication as a vehicle for the formulation of new agency policies, which "are applied and announced therein" and "generally provide a guide to action that the agency may be expected to take in future cases." 394 U.S. at 765–766, 89 S.Ct. at 1429 (Fortas, J.). But if the statements quoted from the opinions of six Justices in *Wyman-Gordon* are to mean anything, they must be read as demanding rule-making here, and given the Board's long-standing negative attitude, as requiring a court to order it. The Board was prescribing a new policy, not just with respect to 25 buyers in Wheatfield, N. Y., but in substance, to use Mr. Justice Douglas' phrase, "to fit all cases at all times." 394 U.S. at 777, 89 S.Ct. at 1435. There must be tens of thousands of manufacturing, wholesale and retail units which employ buyers, and hundreds of thousands of the latter. Yet the Board did not even attempt to inform industry and labor organizations, by means providing some notice though not in conformity with section 4, of its proposed new policy and to invite comment thereon, as it has sometimes done in the past, see Peck, The Atrophied Rule-Making Powers of the National Labor Relations Board, 70 Yale L.J. 729, 756–757 (1961) and did in *Excelsior*, 156 N.L.R.B. at 1238, without thereby satisfying the Supreme Court, 394 U.S. at 764, 89 S.Ct. 1426. Although policy-making by adjudication often cannot be avoided in unfair labor practice cases, since the parties have already acted and the Board must decide one way or the other, there is no such problem in a representation case.[15] Finally, the argu-

---

15. While nominally this comes before us as an unfair labor practice case, in substance the attack is on the Board's decision, un-reviewable at the time, in the representation proceeding.

ment for rule-making is especially strong when the Board is proposing to reverse a long-standing and oft-repeated policy on which industry and labor have relied.[16] To be sure, the change of policy here in question did not expose an employer to new and unexpected liability, as it would have done in NLRB v. Majestic Weaving Co., Inc., 355 F.2d 854, 859–861 (2 Cir. 1966).[17] The point rather is that when the Board has so long been committed to a position, it should be particularly sure that it has all available information before adopting another, in a setting where nothing stands in the way of a rule-making proceeding except the Board's congenital disinclination to follow a procedure which, as said in Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3 Cir. 1969), "enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated," despite the Court's pointed admonitions.[18]

The petition to review is granted and enforcement is denied to the extent that the cause is remanded to the Board for further proceedings consistent with this opinion. No costs.

16. Although Swift & Co., 115 N.L.R.B. 752 (1956), may be the only case in which the Board had squarely held that buyers were not entitled to organize in a union separate from rank-and-file employees, the reasoning of the many decisions in fn. 11 necessarily led to that result so long as the Board classified almost all buyers as "managerial employees."

A number of the decisions that have upheld the Board's reversing prior decisions in adjudicative proceedings have been in situations where the Board has merely prescribed a stricter remedy. See, e. g., NLRB v. A.P.W. Products Co., 316 F.2d 899, 905 (2 Cir. 1963) (retroactively overruling decisions that back pay awards are tolled by examiner's finding of non-violation); cf. International Union of Elec., Radio and Mach. Workers, 138 U.S. App.D.C. 249, 426 F.2d 1243, cert. denied, Tiidee Products Inc. v. International Union of Elec., Radio and Mach. Workers,

400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); H. & F. Binch Co. Plant of Native Laces v. NLRB, 456 F.2d 357, 364–365 (2 Cir. 1972) (enlarging reinstatement rights of economic strikers).

17. In the Binch case, supra note 16, we sustained retroactive application of the Board's decision in The Laidlaw Corporation, 171 N.L.R.B. No. 172 (1968), enforced, 414 F.2d 99 (7 Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970), mainly because it had been presaged by an earlier Supreme Court decision.

18. In March 1970 Professor Bernstein proposed "a two-year moratorium on APA rule-making requirements, during which the Board and its special public canvass their alternatives and seek suitable adjustments." Supra, 79 Yale L.J. at 620–21. Nearly three years have passed, without significant result.